2012 UT 43

Jerome WILSON and Leilani Wilson, as Guardians ad Litem for Jared Tanner Wilson, their minor child, Plaintiffs, Appellants, and Cross–Appellees,

v.

IHC HOSPITALS, INC., dba Utah Valley Regional Medical Center, C. Joseph Glenn, M.D., Steven S. MacArthur, M.D., David H. Broadbent, M.D., Defendants, Appellees, and Cross–Appellants.

No. 20090354.

Supreme Court of Utah.

July 20, 2012.

Roger P. Christensen, Karra J. Porter, Scott T. Evans, Joseph W. Steele, Salt Lake City, for appellants.

Charles W. Dalhquist II, Merrill F. Nelson, Matthew C. Ballard, Joann E. Bott, Steven C. Bednar, Sammi V. Anderson, Salt Lake City, for appellees.

Justice PARRISH, opinion of the Court:

## INTRODUCTION

¶ 1 This case involves a medical malpractice lawsuit brought by Jerome Wilson and Leilani Wilson on behalf of their son, Jared. The Wilsons allege that employees of IHC Hospitals, Inc. (IHC) breached their duty of care during Ms. Wilson's labor and delivery of Jared. The Wilsons further claim that IHC's negligence caused Jared to suffer severe brain damage. The Wilsons tried their claims to a jury in 2008. The jury found that IHC did not act negligently.

¶ 2 The Wilsons appealed based on legal errors committed during the trial and IHC cross-appealed. Of the issues raised on appeal, we find IHC's violation of the collateral source rule to be dispositive. To ensure enforcement of this well-established common-law rule, the Wilsons sought, and received, an in limine order excluding collateral source evidence at trial. But during trial, IHC persistently and deliberately violated the trial court's order. IHC's counsel made numerous, explicit references to collateral source evidence. He also referenced collateral source evidence by repeatedly asking witnesses about the "out-of-pocket expenses" the Wilsons had incurred in caring for Jared. IHC's trial tactics violated the in limine order, misled the trial court and substantially prejudiced the jury. We hold that the collateral source rule precludes both explicit reference and methodical allusion to collateral source benefits. Because IHC repeatedly disregarded the in limine order and violated the collateral source rule, we vacate the jury's verdict and remand this case to the trial court.

¶ 3 To assist the trial court on remand, we address several additional issues raised by the parties. First, we clarify the circumstances under which opposing counsel may meet with a patient's treating physician. In cases where a treating physician is not an employee of a defendant, the physician must notify the patient prior to meeting ex parte with opposing counsel. However, where the treating physician is employed by a defendant and the defendant is alleged to be vicariously liable for the physician's conduct, it is permissible for defense counsel to meet with defendant's employee without notifying the plaintiff. Second, we affirm the trial court's decision to exclude IHCs nurse training modules due to a lack of relevance. Finally, we reverse the trial court's decision to admit IHCs neonatal morbidity and mortality statistics because we find these statistics to be protected by the care review privilege.

## BACKGROUND [1]

### I. JARED WILSON'S BIRTH

¶ 4 Ms. Wilson became pregnant with her third child, Jared, in 1994. Because Ms. Wilson had experienced complications with her previous pregnancies, she selected a high-risk specialist, Dr. Joseph Glenn, as her doctor. On April 11, 1995, Ms. Wilson's water broke and Mr. Wilson drove her to IHC's Utah Valley Regional Medical Center (the Hospital) where she was admitted for observation. Because Jared was only twenty-five weeks in gestational age, Dr. Glenn recommended that Jared be delivered by cesarean section upon any signs of infection, labor, or fetal distress.

¶ 5 On April 19, 1995, Dr. Glenn went on vacation. He arranged for Dr. David Broadbent and Dr. Steven MacArthur to care for Ms. Wilson in his absence.

¶ 6 On April 20th, shortly after 8:15 a.m., the on-call nurse paged Dr. MacArthur to inform him that Ms. Wilson was completely dilated. When Dr. MacArthur arrived, he determined that vaginal delivery was imminent. Jared was delivered at 9:33 a.m.

¶ 7 Approximately ten days after Jared's birth, Dr. Ronald Stoddard ordered an ultrasound of Jared's brain. The reviewing radiologist identified a hemorrhage in Jared's right cerebral hemisphere, marked dilation of his lateral ventricles, and bleeding in his periventricular soft tissues.

### II. THE WILSONS' MEDICAL MALPRACTICE LAWSUIT AGAINST IHC

¶ 8 Approximately six years after Jared's birth, the Wilsons filed a complaint against IHC on Jared's behalf. The complaint alleges that, because IHC "fail[ed] to deliver Jared by cesarean section on a timely basis,

he suffered [brain] hemorrhages, resulting in permanent and severe brain damage which has produced the many disabilities from which he now suffers."

¶ 9 The parties dispute the cause of Jared's brain hemorrhage. The Wilsons contend that the hemorrhage resulted from inadequate oxygenation of Jared's brain during vaginal delivery. They reason that Jared's brain would have remained properly oxygenated had he been delivered by cesarean section. IHC disputes the Wilsons' claim and argues that the hemorrhage occurred after Jared's birth, for reasons unrelated to vaginal delivery.

¶ 10 After lengthy discovery, this case proceeded to trial in 2008. Following a nineteen-day trial, the jury returned a verdict finding that IHC had not been negligent. The following events that occurred prior to and during trial are relevant to this appeal: (A) IHC circumvented the trial court's in limine order excluding collateral source evidence, (B) IHC met ex parte with Jared's treating physicians, (C) the trial court excluded Dr. Fred Hyde's testimony, (D) the trial court excluded IHC's nurse training modules, and (E) the trial court determined that IHC's neonatal morbidity and mortality statistics did not qualify for the care review privilege. We discuss each of these below.

### A. IHC's References to Collateral Source Evidence

¶ 11 Prior to trial, the Wilsons filed a motion in limine, arguing that evidence of collateral source benefits is prejudicial and requesting that the court exclude evidence of the Wilsons' insurance. The trial court granted the Wilsons' motion.

¶ 12 At trial, IHC repeatedly violated the in limine order by questioning witnesses

---

1. IHC filed a motion pursuant to rule 24(k) of the Utah Rules of Appellate Procedure requesting that we strike sections 4, 7, 10, 11, and 12 from the statement of facts in the Wilsons' opening brief. IHC's motion also asks that we assess attorney fees against the Wilsons. Rule 24(k) of the Utah Rules of Appellate Procedure requires briefs to be "free from burdensome, irrelevant, immaterial or scandalous matters." Furthermore, the rule provides that "[b]riefs which are

not in compliance may be disregarded or stricken, on motion or sua sponte by the court, and the court may assess attorney fees against the offending lawyer." The decision to assess attorney fees under rule 24(k) is a matter of discretion. We decline to assess attorney fees in the instant case. But we have disregarded any facts presented in the Wilsons' brief that are irrelevant to our determination of the issues on appeal.

about the collateral source benefits received by the Wilsons. Specifically, IHC questioned witnesses regarding collateral source benefits received from the Utah Division of Service for People with Disabilities (DSPD), Medicaid, and other community, state, and federal assistance programs. In total, IHC made four explicit references to these government benefit programs. For instance, IHC asked Laura Fox, the Wilsons' life care planner, if she was "aware that the [Wilsons] are already getting respite care .... [f]rom the [S]tate of Utah?" Ms. Fox replied "[t]he parents are getting an annual stipend of money from DSPD, that they can use for respite care."

¶ 13 IHC also violated the in limine order by repeatedly referencing the fact that the Wilsons had not incurred any out-of-pocket costs in providing care for Jared. In total, IHC made ten references to the absence of any out-of-pocket expenses. These questions commenced during cross-examination of Jerome Wilson, Jared's father, who was the Wilsons' first witness. IHC asked Mr. Wilson five times about the out-of-pocket expenses he had incurred in caring for Jared. For example, IHC asked Mr. Wilson the following series of questions:

Q. (by IHC'S COUNSEL) Mr. Wilson isn't it true that in your deposition, in 2003, that you testified that your expenses were minimal?

A. (by JEROME WILSON) Yes.

Q. Okay. And when you were asked if they were around $100, you said, possibly a little more but not much?

A. Yes.

Q. All right. Thank you. And that was seven years into Jared's life.

A. Yes.

¶ 14 On the next day of trial, IHC asked Ms. Fox about out-of-pocket expenses four times. For example, while questioning her about a possible gastrostomy for Jared, IHC asked, "do you know how much the parents will have to pay out-of-pocket for that procedure?" Ms. Fox responded "I do not put out-of-pocket costs in the life care plan." Several days later, IHC also questioned Dr. Paul Randle, the Wilsons' economist, about

out-of-pocket expenses. IHC's most blatant reference to out-of-pocket expenses occurred during its closing argument, when IHC told the jury "[Jared is] getting the hospital and medical care he needs ... [a]nd you have also heard that it's not costing the parents. They're not claiming one cent of out-of-pocket expenses."

¶ 15 Throughout trial, the Wilsons maintained that IHC's references violated the trial court's in limine order and they employed several tools in an attempt to mitigate the resulting prejudice. First, the Wilsons objected to IHC's questions. For instance, when IHC asked Mr. Wilson what out-of-pocket expenses his family incurred for Jared's wheelchair, the Wilsons' counsel stated "I'm going to object to this as a direct violation of the Court's order." The Wilsons similarly objected to IHC's references to government benefit programs and out-of-pocket expenses seven more times during the trial. Second, in an effort to stop IHC's repeated references to an absence of out-of-pocket expenses, the Wilsons stipulated that they were not claiming any out-of-pocket expenses. The trial court acknowledged the stipulation. Nevertheless, IHC continued to reference the absence of any out-of-pocket expenses and the availability of government benefit programs during the trial. And the Wilsons continued to object to these references, stating "[y]our Honor, it's irrelevant.... It's been stipulated to." Finally, the Wilsons moved for a mistrial. One of the grounds specified in support of the Wilsons' motion was that "[t]he collateral source rule, which the Court rule[d on] in response to our motion in limine[,] ... was blatantly violated." But the trial court denied the motion.

### B. IHC's Ex Parte Meetings With Jared's Treating Physicians

¶ 16 On February 21, 2003, an MRI was taken of Jared's brain at Primary Children's Medical Center. Dr. Richard Boyer, a physician employed by Primary Children's Neuroradiology Department, reviewed the MRI. He concluded that the MRI showed that Jared's brain injury was "consistent with pre-term delivery ... [that] appears to be a combination of periventricular leukomalacia

(PVL) and effects of periventricular hemorrhagic (PVH) infarction Grade IV." Dr. Boyer later testified that these findings were consistent with, but not necessarily caused by, inadequate oxygenation of the brain at the time of Jared's birth.

¶ 17 On April 9, 2003, IHC's counsel met ex parte with Dr. Boyer without providing any notice to the Wilsons. That same day, Dr. Boyer added an addendum to Jared's medical record, in which he noted that Jared's February 2003 MRI showed evidence that Jared suffered from a congenital brain defect. While Dr. Boyer's addendum was consistent with an earlier report in which he had indicated that a CT scan showed evidence of a congenital brain defect, the addendum was at odds with his finding that Jared's injury was consistent with inadequate oxygenation of the brain at the time of birth. Dr. Boyer later agreed to testify at trial as an expert for IHC.

¶ 18 In addition to meeting with Dr. Boyer, IHC's counsel also met ex parte with several of its employee-physicians who had treated Jared. These ex parte meetings involved Dr. Donald Stoddard, Dr. Steven Minton, and Dr. Steven Clark. These meetings also took place without any prior notice to the Wilsons.

### C. The Trial Court Excluded Portions of Dr. Hyde's Expert Testimony

¶ 19 The Wilsons retained Dr. Fred Hyde as an expert witness. They sought to introduce testimony through Dr. Hyde about the standard of care for providing continuity of care when a physician leaves town; about IHCs market share; and about IHC's ability to use its market share to influence the opinions of physicians testifying in this case. The Wilsons intended to use Dr. Hyde's testimony to impeach Dr. Boyer and Dr. Minton. During a pretrial hearing, the trial court authorized Dr. Hyde to testify regarding continuity of care, but ruled that Dr. Hyde could not testify regarding IHCs market share and its ability to influence witnesses. Relying on rule 403 of the Utah Rules of Evidence, the trial court found that his testimony would "encompass[ ] a large collateral discussion" and "represent[ed] a large commitment of time and judicial re-

sources." The trial court also determined that Dr. Hyde did not qualify as an expert regarding IHC's market share under rule 702 of the Utah Rules of Evidence.

### D. The Trial Court Excluded Nurse Training Modules Due to Lack of Foundation

¶ 20 Before trial, the Wilsons requested that IHC produce any documents or records related to nursing protocols and nurse training. In response, IHC produced a variety of its policies, procedures, and protocols, along with a series of VCR tapes, responsive to the Wilsons' request. The Wilsons complained that IHC had failed to produce its nurse training modules. Thereafter, the Wilsons moved to introduce nurse training modules that their counsel had acquired in other litigation against IHC. The trial court denied the Wilsons' request, finding that the training modules were authentic, but lacked adequate foundation.

### E. The Trial Court Admitted IHC's Neonatal Morbidity and Mortality Statistics

¶ 21 The Wilsons requested that IHC produce statistics for preterm babies born at the Hospital. Although IHC maintained mortality and morbidity statistics for its newborn ICUs, it refused to produce them, claiming they were privileged under section 26-25-3 of the Utah Code. The trial court disagreed, ordered their production, and received them into evidence over IHC's objection.

### III. THE JURY'S VERDICT, POSTTRIAL MOTIONS, AND THE WILSONS' APPEAL

¶ 22 The jury returned a verdict finding no negligence on the part of IHC, and the Wilsons moved for a new trial. The Wilsons argued, among other things, that the trial court erroneously admitted collateral source evidence and that IHC's ex parte meetings with Jared's treating physicians prejudiced the jury's verdict. The trial court denied the Wilsons' motion. The Wilsons appealed based on legal errors committed during the trial and IHC cross-appealed. We have ju-

risdiction pursuant to section 78A–3–102(3)(j) of the Utah Code.

## STANDARD OF REVIEW

¶ 23 The parties argue that a number of the trial court's evidentiary rulings were erroneous. Specifically, the Wilsons argue that the trial court erroneously failed to enforce the collateral source rule, permitted Jared's treating physicians to meet ex parte with opposing counsel, and excluded nurse training modules as irrelevant. And IHC claims that the trial court erroneously admitted IHC's neonatal morbidity and mortality statistics.

■■■■ ¶ 24 In reviewing these claims, we apply several different standards of review.[2] The question of whether the trial court "was correct in its application of the collateral source rule is a question of law that we review for correctness, without deference to the [trial] court's conclusions." *Mahana v. Onyx Acceptance Corp.*, 2004 UT 59, ¶ 35, 96 P.3d 893. The permissibility of defense counsel's ex parte meetings with a plaintiff's treating physicians requires interpretation of our previous decisions. And "[t]he interpretation of precedent is a question of law that we review for correctness." *Utah Dep't of Transp. v. Admiral Beverage Corp.*, 2011 UT 62, ¶ 14, 275 P.3d 208. Trial courts have broad discretion in determining whether evidence is relevant under rule 402 of the Utah Rules of Evidence. *State v. Fedorowicz,*

2002 UT 67, ¶ 32, 52 P.3d 1194. Accordingly, we review the admissibility of evidence under rule 402 for an abuse of discretion. *Id.* "The existence of a privilege is a question of law for the court, which we review for correctness." *Debry v. Goates*, 2000 UT App 58, ¶ 13, 999 P.2d 582 (internal quotation marks omitted); *see also Cannon v. Salt Lake Reg'l Med. Ctr., Inc.*, 2005 UT App 352, ¶ 7, 121 P.3d 74. Finally, we note that trial court errors will "require reversal only if [our] confidence in the jury's verdict is undermined." *Tingey v. Christensen*, 1999 UT 68, ¶ 16, 987 P.2d 588.

## ANALYSIS

■■■■ ¶ 25 The Wilsons identify five errors that they believe entitle them to a new trial. In particular, the Wilsons make the following claims: (1) the trial court erred in allowing IHC to repeatedly reference collateral source evidence, (2) the trial court erred in granting IHC's motion in limine to exclude portions of Dr. Fred Hyde's testimony,[3] (3) IHC's ex parte meetings with Jared's treating physicians prejudiced the Wilsons' case and the trial court erred in admitting the testimony of Dr. Stoddard, (4) the trial court erred in refusing to admit IHC's nurse training modules, and (5) the trial court erred in admitting into evidence a Utah district court decision, which the Wilsons allege conflicts with Utah law. Additionally, the Wilsons argue that the cumulative impact of these

---

**2.** We provide a standard of review only for the issues we address substantively.

**3.** The trial court excluded Dr. Hyde's proffered testimony that IHC has a dominant market share in Utah County and could use its market power to influence the opinions of physicians testifying in this case. The trial court rooted its decision in rules 403 and 702 of the Utah Rules of Evidence. On appeal, the Wilsons reiterate the purpose for Dr. Hyde's testimony. They also explain that Dr. Hyde's testimony may permissibly show bias under rule 608(c) of the Utah Rules of Evidence. But their brief fails to address rule 403, rule 702, and the trial court's decision. Rule 24(a)(9) of the Utah Rules of Appellate Procedure states that the appellant's argument "shall contain the contentions and reasons of the appellant with respect to the issues presented ... with citations to the authorities, statutes, and parts of the record relied on." To satisfy rule 24(a)(9), the argument

"must provide meaningful legal analysis." *W. Jordan City v. Goodman*, 2006 UT 27, ¶ 29, 135 P.3d 874 (internal quotation marks omitted). That is, the brief "must go beyond providing conclusory statements and fully identify, analyze, and cite its legal arguments." *Id.* (internal quotation marks omitted). The required analysis involves "not just bald citation to authority but development of that authority and reasoned analysis based on that authority." *Id.* (internal quotation marks omitted). We reiterate that "[t]his court is not a depository in which the appealing party may dump the burden of argument and research." *Id.* (internal quotation marks omitted). Because the Wilsons provided no argument, citation to authority, or legal analysis to show that the trial court erred in excluding these portions of Dr. Hyde's testimony, we decline to address this argument.

errors requires a new trial.[4]

¶ 26 IHC cross-appeals. IHC first appeals the trial court's decision to award costs only against Jared, instead of against Jared's parents. IHC also asks that we award it costs for the Wilsons' use of its trial transcripts on appeal.[5] In the event of a remand, IHC requests that we reverse the trial court's decision allowing the admission of the Hospital's neonatal morbidity and mortality statistics and that we hold Jury Instruction No. 39 was given in error.

¶ 27 We agree with the Wilsons that IHC's persistent and deliberate references to collateral source evidence in violation of the trial court's in limine order substantially prejudiced the jury. We therefore vacate the jury's verdict and remand for a new trial. We address the remaining issues raised by the parties to guide the trial court on remand.

## I. IHC PREJUDICED THE WILSONS BY PERSISTENTLY AND DELIBERATELY INTRODUCING COLLATERAL SOURCE EVIDENCE

¶ 28 The Wilsons' complaint seeks compensatory damages for past, present, and future medical expenses associated with providing care for Jared. At the time of the trial, the bulk of Jared's medical expenses had been paid by private insurance and public benefit programs. The Wilsons were concerned that, if evidence of private insurance and public benefit program payments was pre-

sented at trial, the jury would infer that the Wilsons were seeking a double recovery, thereby prejudicing their case. To avoid this prejudice, the Wilsons filed a pretrial motion in limine asking the trial court to exclude collateral source evidence. The trial court granted the motion and ordered the parties to present "evidence on the subject of health insurance benefits outside the presence of the jury" and to redact health insurance benefits from exhibits submitted to the jury. IHC does not dispute the validity of this order in its cross-appeal.

▬▬▬▬▬ ¶ 29 The Wilsons argue that IHC repeatedly violated the in limine order by questioning witnesses about payments the Wilsons received from government benefit programs and by highlighting the lack of out-of-pocket expenses incurred by the Wilsons in providing care for Jared.[6] We agree with the Wilsons.

¶ 30 We address the parties' arguments in four separate sections. First, we hold that IHC made improper references to collateral source evidence at trial. Second, we conclude that IHC's references prejudiced the Wilsons. Third, we hold that the trial court's jury instructions failed to cure the prejudice suffered by the Wilsons. Finally, we conclude that the Wilsons did not forfeit their right to object to IHC's collateral source references on appeal through either waiver or the doctrine of invited error.

---

4. Because we remand for a new trial based on IHC's violation of the collateral source rule, it is not necessary for us to address the Wilsons' claim of cumulative error.

5. Because we vacate the jury's verdict and remand this case for a new trial, we need not address whether the trial court erred by only awarding costs against Jared. See UTAH R.CIV.P. 54(d). Similarly, we need not address whether IHC should be awarded costs for the Wilsons' use of its trial transcripts on appeal. See UTAH R.APP. P. 34(c).

6. IHC asserts that the Wilsons failed to preserve the collateral source issue for appeal. Specifically, IHC claims that the Wilsons failed to make a timely, specific objection to the introduction of collateral source evidence and that the Wilsons' motion for mistrial did not preserve the issue. We are unpersuaded by IHC's claim. "An issue is preserved for appeal when it has been present-

ed to the [trial] court in such a way that the court has an opportunity to rule on [it]." *Patterson v. Patterson*, 2011 UT 68, ¶ 12, 266 P.3d 828 (second alteration in original) (internal quotation marks omitted). On the fourth day of trial, when IHC asked Mr. Wilson about the amount of out-of-pocket expenses his family had incurred in purchasing Jared's wheelchair, the Wilsons objected, arguing "this [is] a direct violation of the Court's order." The trial judge then held a bench conference where the parties discussed the relationship between medical expenses, insurance, and out-of-pocket expenses. This objection was both timely and sufficient to preserve the collateral source issue for appeal. And we reach this conclusion without deciding whether the Wilsons' motion in limine, other trial objections, and motion for mistrial provide independent grounds for preserving the issue.

### A. IHC Persistently and Deliberately Violated the Collateral Source Rule at Trial

¶31 Under the common law collateral source rule, "a wrongdoer is not entitled to have damages, for which he is liable, reduced by proof that the plaintiff has received or will receive compensation or indemnity for the loss from an independent collateral source." *Mahana v. Onyx Acceptance Corp.*, 2004 UT 59, ¶37, 96 P.3d 893 (internal quotation marks omitted). Two policy rationales support the rule. "First, public policy favors giving the plaintiff a double recovery rather than allowing a wrongdoer to enjoy reduced liability simply because the plaintiff received compensation from an independent source." *Green v. Denver & Rio Grande W. R.R. Co.*, 59 F.3d 1029, 1032 (10th Cir.1995). Second, "the rule encourages the maintenance of insurance" by assuring that "a plaintiff's payments from a collateral source will not be reduced by a subsequent judgment." *Id.*

¶32 The Utah Legislature has recognized and statutorily modified the collateral source rule as it applies to medical malpractice cases. Utah Code § 78B–3–405.[7] Although collateral source evidence is still not considered appropriate for jury consideration, the Legislature has altered the common law policy presumption that "favor[ed] giving the plaintiff a double recovery." *Green*, 59 F.3d at 1032. To accomplish this, the Legislature has passed a statute mandating that, "[u]pon a finding of liability and an awarding of damages by the trier of fact," trial courts "shall reduce the amount of the award by the total of all amounts paid to the plaintiff from all collateral sources which are available to him." Utah Code § 78B–3–405(1)–(2). But the statute limits these reductions by prohibiting any reduction in a damages award for collateral sources that have subrogation rights.[8] *Id.* § 78B–3–405(1).

¶33 Our evaluation of whether IHC violated the collateral source rule requires us to address two questions. First, we determine whether the Wilsons received collateral source benefits. Second, we analyze whether IHC's questions regarding these benefits and the absence of any out-of-pocket expenses violated the collateral source rule.

¶34 We begin by determining whether the Wilsons received collateral source benefits. In the context of medical malpractice cases, the Legislature has defined the phrase "collateral source" to include various types of "payments made to or for the benefit of the plaintiff." *Id.* § 78B–3–405(3). Two types are relevant here. First, collateral source payments include "medical expenses and disability payments payable under the United States Social Security Act, any federal, state, or local income disability act, or any other public program, except the federal programs which are required by law to seek subrogation." *Id.* § 78B–3–405(3)(a). Second, the phrase includes "any health, sickness, or income replacement insurance ... and any other similar insurance benefits ... whether purchased by the plaintiff or provided by others." *Id.* § 78B–3–405(3)(b).

¶35 Both public and private collateral sources have made payments "to or for the benefit" of Jared. These include Medicaid payments made pursuant to the Social Security Act, 42 U.S.C. §§ 1396 to 1396w–5, and assistance from the DSPD pursuant to section 62A–5–103(1) of the Utah Code.[9] Both programs qualify as collateral sources under section 78B–3–405(3)(a). In addition, the Wilsons had private health insurance that made payments "to or for the benefit" of Jared. Private health insurance also qualifies as a collateral source under section 78B–3–405(3)(b). We thus conclude the Wilsons received collateral source benefits.

---

7. The Wilsons filed their complaint on March 8, 2001. While the section at issue here has been amended, changed stylistically, and renumbered since the Wilsons filed their complaint, it has not been changed substantively. As a result, we refer to the current version of section 78B–3–405.

8. The statute did not come into play in this case because the Wilsons did not receive a damages award.

9. Utah Code § 62A–5–103(1) (2001). We reference the version of section 62A–5–103 in effect in 2001, when the Wilsons filed their complaint, because the Legislature rewrote portions of the section in 2005. *See id.* § 62A–5–103.

¶ 36 Next, we evaluate whether IHC violated the collateral source rule. IHC brought these collateral source payments to the attention of the jury in two ways. First, IHC referenced them directly. Second, IHC repeatedly made reference to the fact that the Wilsons had not incurred any out-of-pocket expenses for Jared's care. And IHC's repeated reference to this fact erroneously suggested that the Wilsons were seeking a double recovery or windfall. *See Cates v. Wilson*, 321 N.C. 1, 361 S.E.2d 734, 740 (1987) (holding that collateral source evidence suggests to the jury that "plaintiffs are already fully compensated and [are] trying to obtain a double recovery" (internal quotation marks omitted)).

¶ 37 The Wilsons' complaint seeks damages for, inter alia, past medical expenses incurred in providing care for Jared, as well as future anticipated medical expenses. Medical expenses are a form of compensatory damages.[10] *See Wills v. Foster*, 229 Ill.2d 393, 323 Ill.Dec. 26, 892 N.E.2d 1018, 1033 (2008). Upon proof of liability, a plaintiff may recover medical expenses that are reasonable and necessary.[11] *Gorostieta v. Parkinson*, 2000 UT 99, ¶ 35 & n. 8, 17 P.3d 1110; RESTATEMENT (SECOND) OF TORTS § 924(c) (1979).

¶ 38 How a plaintiff satisfies his medical expense obligations presents a separate issue that is irrelevant to calculation of his damages. A plaintiff may use one or more sources to pay his total medical expenses. For instance, a plaintiff may pay for medical expenses personally, out-of-pocket.[12] Or, a plaintiff's medical expenses may be paid by a variety of third party sources, including private insurance or public benefit programs. "The law does not differentiate between the nature of [these third-party source pay-

ments], so long as they did not come from the defendant...." RESTATEMENT (SECOND) OF TORTS § 920A cmt. b (1979); *see also Wills*, 323 Ill.Dec. 26, 892 N.E.2d at 1030 (noting that "the Restatement allows all injured plaintiffs to recover the reasonable value of medical expenses and does not distinguish between those who have private insurance, those whose expenses are paid by the government, or those who receive their treatment on a gratuitous basis"). In other words, for the purpose of calculating medical expense damages, it is the defendant's responsibility "to compensate for all harm that he causes, not confined to the net loss that the injured party receives." RESTATEMENT (SECOND) OF TORTS § 920A cmt. b.

¶ 39 Two important conclusions are apparent. First, out-of-pocket expenses refers to how a plaintiff may pay for his medical expenses, but they are not a separate category of damages.[13] Second, out-of-pocket expenses and collateral source payments bear an inverse relationship to each other. That is, where third-party sources pay a portion of a plaintiff's medical expenses, the plaintiff will necessarily have paid a smaller portion of those expenses out-of-pocket. In short, reference to the absence of any significant out-of-pocket medical expenses necessarily implies that the expenses have been paid by collateral sources.

¶ 40 There can be no dispute that IHC made repeated reference to collateral source evidence in violation of the collateral source rule. The transcript reveals at least four explicit references and ten implicit references. For example, IHC cross-examined Laura Fox, the Wilsons' life care planner, about the medical expenses included in her lifecare plan. In concluding its questioning, IHC asked Ms. Fox: "[A]re[you] aware that

---

10. Compensatory damages seek to "place the plaintiff in the same position he would have occupied had the tort not been committed." *Mahana v. Onyx Acceptance Corp.*, 2004 UT 59, ¶ 26, 96 P.3d 893.

11. We note that the trial court properly instructed the jury regarding medical expenses. The instruction stated "[e]conomic damages include reasonable and necessary expenses for medical and other care."

12. An "out-of-pocket expense" is "[a]n expense paid from one's own funds." BLACK'S LAW DICTIONARY 659 (9th ed. 2009).

13. We reject any contention that out-of-pocket expenses refers to a category of damages distinct from the Wilsons' medical expenses. Indeed, IHC consistently referred to out-of-pocket expenses in tandem with medical expenses. *Infra* ¶ 44.

state and federal government, through schools, through community and Medicaid and other federally-assisted [sic] programs, already provide much of what you've recommended." Ms. Fox answered yes.

■ ¶ 41 An example of IHC's implicit references to collateral source payments is found in its questioning of Jerome Wilson, who is Jared's father. IHC asked Mr. Wilson "we have your medical expenses, but we don't have the amount that you've paid for out-of-pocket expenses. . . . I noticed that Jared had a [special] wheelchair as he came in here today[.] . . . How much of that did you pay out of your pocket?" Mr. Wilson replied "[n]one." IHC also asked Ms. Fox questions regarding out-of-pocket expenses. For example, during its cross-examination of Ms. Fox, IHC again brought up Jared's wheelchair. IHC asked Ms. Fox "I note that you've included costs for a wheelchair replaced every five years. Are you aware that Mr. Wilson testified that there was no cost [for] the wheelchair Jared used the day he came into court?"

¶ 42 IHC also raised the absence of out-of-pocket expenses during cross-examination of Dr. Paul Randle, the Wilsons' economist. And IHC focused on the lack of out-of-pocket expenses in its closing argument. IHC's counsel stated "[Jared is] getting the hospital and medical care he needs . . . [a]nd you have also heard that it's not costing the parents. They're not claiming one cent of out-of-pocket expenses. . . . They have stipulated that there are no out-of-pocket costs. So you don't need to worry about that."

¶ 43 We cannot escape the conclusion that IHC adopted a trial strategy of circumventing the trial court's in limine order by presenting forbidden collateral source evidence to the jury. We reach this conclusion based on IHC's consistent explicit and implicit references to collateral source evidence throughout trial.

■ ¶ 44 Our conclusion is bolstered by IHC's inability to offer a legitimate purpose

for the evidence. During a bench conference, IHC contended that out-of-pocket expenses did not relate to medical expenses. But IHC's questions indisputably related to Jared's medical expenses, and IHC consistently paired out-of-pocket expenses and medical expenses in the same question. For instance, IHC asked Dr. Randle if he was "informed that the plaintiffs have stipulated that there are not *out-of-pocket expenses for medical* in this case." Over the Wilsons' objection, Mr. Randle was permitted to reply "I'm aware that insurance and/ or Medicaid . . . have paid most of the expenses." Similarly, in cross-examining Mr. Wilson, IHC's counsel stated, "we have your *medical expenses,* but we don't have the amount that you've paid for *out-of-pocket expenses.*" IHC then asked Mr. Wilson how much he had paid "out of [his] pocket" for Jared's "special wheelchair." Mr. Wilson replied that he had paid nothing for the wheelchair. By eliciting this response, IHC demonstrated that the Wilsons had incurred minimal personal expense in providing care for Jared. It also guided the jury to the inescapable conclusion that the Wilsons' medical expenses were paid for by collateral sources. Reference to the amount of collateral source payments a plaintiff has received is as violative of the collateral source rule as reference to the source of payment. *Sheehy v. S. Pac. Transp. Co.,* 631 F.2d 649, 653 (9th Cir.1980) ("The pitfalls [of admitting collateral source benefits] are not avoided by permitting evidence of the amount but not the source of such collateral benefits.").[14]

¶ 45 In summary, the Wilsons received assistance paying for Jared's medical expenses from collateral sources, including private insurers and public benefit programs. By developing testimony that the Wilsons had incurred nominal out-of-pocket expenses caring for Jared, IHC implied that the Wilsons had received substantial collateral source benefits. IHC also made explicit references to collateral source evidence during

---

14. And even if IHC had an independent purpose for developing out-of-pocket expense evidence, that evidence was not relevant. The Wilsons eliminated any potentially relevant purpose for examination regarding out-of-pocket expenses by stipulating on the fourth day of trial that they would not claim them. Despite this, IHC continued to make reference to out-of-pocket expenses on subsequent days of trial and in its closing argument.

the trial. IHC's explicit and implicit collateral source references reflect a persistent and deliberate strategy to place prejudicial collateral source evidence before the jury.

### B. IHC's Statements in Violation of the Collateral Source Rule Prejudiced the Wilsons

¶ 46 The Wilsons argue that "IHC hopelessly prejudiced the credibility of [their] case" by "improperly and inaccurately telling the jury [they] never paid one cent for Jared's care." We agree.

¶ 47 It has long been recognized that evidence of collateral source benefits "involves a substantial likelihood of prejudicial impact." *See Eichel v. N.Y. Cent. R.R. Co.*, 375 U.S. 253, 255, 84 S.Ct. 316, 11 L.Ed.2d 307 (1963) (per curiam); *see also Robinson v. All–Star Delivery, Inc.*, 1999 UT 109, ¶ 23, 992 P.2d 969 (noting that evidence of "disability benefits is potentially very prejudicial" to a plaintiff). This prejudicial impact is two-fold. First, the evidence suggests to the jury that the plaintiff is already receiving the care that he needs. Thus, the jury believes that "the outcome of the trial is immaterial to the party benefitting from the collateral source." *Cates*, 361 S.E.2d at 740. Second, because most jurors do not understand the concept of subrogation rights, they will erroneously conclude that the plaintiff is seeking a windfall. This is highly prejudicial because the jury will believe that the plaintiff has already been "fully compensated and [is] trying to obtain a double recovery." *Id.* (internal quotation marks omitted); *see also Green*, 59 F.3d at 1033–34 ("[T]he jury may feel that awarding damages would overcompensate the plaintiff for his injury. . . ." (internal quotation marks omitted)); *Williams v. Asplundh Tree Expert Co.*, No. 3:05–cv–479–J–33MCR, 2006 WL 2942796, at *2 (M.D.Fla. Oct. 9, 2006) ("There is substantial danger of unfair prejudice in this [collateral source] evidence. The jury may believe that [the plaintiff] is trying to receive a double recovery for a single harm").

¶ 48 The Legislature implicitly recognized the prejudice that accompanies collateral source evidence in the Utah Health Care Malpractice Act. The Act requires that, "[u]pon a finding of liability and an awarding of damages by the trier of fact" the trial court shall "reduce the amount of the award by the total of all amounts paid to the plaintiff from all collateral sources" UTAH CODE § 78B–3–405(1)–(2). But "[n]o reduction may be made for collateral sources for which a subrogation right exists." *Id.* § 78B–3–405(1). It is significant that the Legislature placed authority to modify a damages award in the hands of the trial judge, after the jury has already reached its verdict. This procedure prevents the jury from hearing prejudicial collateral source evidence.

¶ 49 Courts have recognized that the prejudice resulting from collateral source evidence may impact both a jury's liability and damage determinations. *Tipton v. Socony Mobil Oil Co.*, 375 U.S. 34, 37, 84 S.Ct. 1, 11 L.Ed.2d 4 (1963) ("We disagree with the suggestion . . . that the prejudicial effect of the evidence of other compensation would be restricted to the issue of damages and would not affect the determination of liability."); *Green*, 59 F.3d at 1033 ("The major reason for excluding collateral source evidence is the concern that juries will be more likely to find no liability if they know that [the] plaintiff has received some compensation."); *Sheehy*, 631 F.2d at 651–52 ("Courts have consistently interpreted *Eichel* to preclude admission of evidence of collateral benefits whether such evidence is presented during the liability or damages phase of the trial."); *Cates*, 361 S.E.2d at 740 ("In light of this kind of argument and the nature of the collateral source evidence which was so freely admitted, we find unpersuasive defendants' contention that the jury's consideration of the liability issues was unaffected by this evidence").

¶ 50 In *Cates*, the North Carolina Supreme Court held that the plaintiff's right to a fair trial was compromised by the admission of collateral source evidence. 361 S.E.2d at 740. *Cates* involved plaintiff Joyce Cates' claim that her child, Morgan Cates, was born mentally retarded and with cerebral palsy due to the malpractice of Dr. Stanley Wilson. *Id.* at 736. In closing argument, counsel for Dr. Wilson referred to collateral source evidence to argue that Morgan had suffered no damages. *Id.* at 740. Specifically, Dr. Wil-

son declared that "there is not one penny of loss that you all have heard that Morgan Cates or his mother has paid .... [n]ot one penny." *Id.* (internal quotation marks omitted). Then, Dr. Wilson asserted that "plaintiffs failed to prove that this child would suffer a penny with its Medicaid, its Aid to Dependent Children, its own father looking after it and supporting it." *Id.* (internal quotation marks omitted). Finally, he stated that "until [Morgan]'s 22 he'll get the free care right there, the daily care at one of the best facilities in the country." *Id.* (alteration in original) (internal quotation marks omitted). The North Carolina Supreme Court held "defendants' emphasis throughout the trial on the numerous gratuitous avenues of compensation [that] existed for plaintiffs' benefit substantially eroded plaintiffs' verdict-worthiness by suggesting to the jury that plaintiffs were already fully compensated and were trying to obtain a double recovery." *Id.* (alteration in original) (internal quotation marks omitted).

¶ 51 The facts of this case are strikingly similar to *Cates.* Here, IHC made both explicit and implicit references to collateral source evidence throughout the trial. These included explicit statements that the Wilsons received collateral source benefits from Medicaid, DSPD, and other government-assistance programs and repeated references to the absence of any out-of-pocket costs incurred by the Wilsons. *See supra* ¶¶ 12–14, 40–42. And these references were emphasized in closing argument by IHC's counsel, who stated:

> This also isn't a case about whether Jared is happy and well taken care of. That's not what this case is about. You've heard the testimony from Dr. Janzen that Jared is doing fine. He's ... receiving the care that he needs. He's receiving the schooling that he needs. He's getting the therapy he needs. He's getting the hospital and medical care he needs. He has the wheelchair that he needs. He has what he needs. *And you have also heard that it's*

> *not costing the parents. They're not claiming one cent of out-of-pocket expenses.*

Throughout trial, IHC emphasized that the Wilsons had incurred nominal out-of-pocket expenses for providing care to Jared, but were also claiming nearly $800,000 in medical expenses. IHC's references were calculated to contrast the Wilsons' nominal out-of-pocket expenses with their claimed medical expenses and to emphasize that the Wilsons were seeking to profit from Jared's injuries by obtaining a double recovery. *See Cates,* 361 S.E.2d at 740. And "[o]nce this prejudicial cat is out of the bag, it is difficult for a jury's verdict to be unaffected by this [collateral source evidence]." *Finley v. Nat'l R.R. Passenger Corp.,* 1 F.Supp.2d 440, 444 (E.D.Pa.1998). As a result, we conclude that IHC's trial strategy substantially prejudiced the Wilsons' verdict-worthiness before the jury.

¶ 52 The trial court's rulings on the Wilsons' motion for mistrial and later motion for new trial do not upset this conclusion. The Wilsons have not asked us to review these rulings. And the rulings do not inform whether IHC's collateral source references prejudiced the Wilsons. In ruling on the motion for mistrial, the trial court made no findings or conclusions that prejudice did, or did not, result from IHC's collateral source references. Later, when addressing the motion for new trial, the trial court stated "I don't like what's happened but ... I draw the conclusion that it did not result in a substantial error prejudicial to the plaintiff." It is unclear whether the court meant that no substantial *legal* error occurred or that IHC's references, even if legally impermissible, had no prejudicial effect on the Wilsons. If the latter, the trial court made no factual findings with respect to prejudice to which we owe deference and, as we have explained, the trial court's legal determination that IHC's references to out-of-pocket expenses were somehow legitimate was erroneous.[15] *Supra* ¶¶ 43, 45.

---

15. To the extent that our resolution of this issue required review of the trial court's denial of the Wilsons' motion for new trial, our review is for an abuse of discretion. *See Sanpete Am., LLC v.*

*Willardsen,* 2011 UT 48, ¶ 28, 269 P.3d 118. A trial court abuses its discretion if it commits legal error. *Goggin v. Goggin,* 2011 UT 76, ¶ 26, 267 P.3d 885. Here, the trial court committed

## C. The Trial Court's Written Jury Instructions Failed to Cure the Prejudice to the Wilsons

¶ 53 IHC argues that the trial court cured any potential prejudice to the Wilsons by providing jury instructions that were consistent with the law and the parties' stipulation regarding out-of-pocket expenses. In particular, IHC notes that the jury instructions directed the jury to award damages that fully compensated the plaintiff and not to consider other possible sources of benefit. Similarly, IHC points out that the jury instructions identified that Medicaid and private healthcare insurers held liens on the Wilsons' potential recovery. Finally, IHC contends that the trial court properly instructed that the jury could consider evidence regarding future government benefits so long as those benefits are available irrespective of income.

¶ 54 "[I]n a proper case an appropriate instruction could cure the error" that results from improper introduction of collateral source evidence. *Riddle v. Exxon Transp. Co.*, 563 F.2d 1103, 1108 (4th Cir. 1977); *see also State v. Harmon*, 956 P.2d 262, 271 (Utah 1998) (plurality opinion) ("[C]urative instructions are a settled and necessary feature of our judicial process and one of the most important tools by which a court may remedy errors at trial.") But we have recognized that curative instructions are not a "cure-all." *Harmon*, 956 P.2d at 273. "Some errors may be too prejudicial for curative instructions to mitigate their effect, and a new trial may be the only proper remedy." *Id.* For example, a curative instruction is insufficient if the complaining party can either show the verdict returned was adversely affected by the improper statements or "counsel made persistent and studied attempts to bring the objectionable matter before the jury." *Riddle*, 563 F.2d at 1108. In this case, the trial court's written

jury instructions failed to cure the prejudice resulting from IHC's improper collateral source references because IHC's counsel "made persistent and studied attempts" to bring the collateral source evidence to the attention of the jury. Under these circumstances, the curative instructions can be insufficient.

¶ 55 The trial court gave several instructions applicable to collateral source evidence. Instruction No. 48 states "[i]f you find fault that caused injury to the plaintiffs, you shall award damages in an amount that fully compensates the plaintiffs. Do not ... consider any other possible sources of benefit the plaintiffs may have received. After you have returned your verdict, I will make whatever adjustments may be appropriate." Next, Instruction No. 50 states "[u]nder the law, Medicaid and plaintiffs' healthcare insurers have liens entitling them to be reimbursed from any award in this case for the amounts which they have paid for past medical expenses incurred as a result of Jared Wilson's injuries." Finally, Instruction No. 51 notes that the jury could properly consider "evidence regarding governmental programs that may be of future benefit to the plaintiffs if such programs meet the limited criteria that they will be available irrespective of the recipient's ability to pay. Medicaid is not such a program, and may not be considered."

¶ 56 The trial court did not give these instructions to the jury until after closing arguments. But IHC had made references to collateral source benefits and out-of-pocket expenses throughout trial. In response, the Wilsons lodged nine separate objections.[16] The trial court sustained only two of these objections, held three bench conferences to consider others, and counsel for IHC withdrew some of his questions after objections were made.[17] But the questions themselves served to keep the collateral source payments (about which the jury had already

---

legal. error, and therefore abused its discretion, when it held that IHC did not violate the collateral source rule.

**16.** Two of these objections came before the Wilsons stipulated that they did not claim any out-of-pocket expenses, IHC's questions were, nevertheless, impermissible. It was not the stipulation that made them improper. Rather, the questions

violated the pretrial in limine order prohibiting collateral source references.

**17.** That IHC withdrew some of its questions in no way changes the fact that IHC continually attempted to present collateral source evidence to the jury. Moreover, it is undisputed that the trial court permitted IHC to present collateral source evidence over the Wilsons' objections in other instances.

heard) fresh in the jurors' minds. While the trial court's written jury instructions may have had some mitigating effect, the introduction of collateral source evidence was neither isolated nor inadvertent; rather, IHC's counsel "made persistent and studied attempts" to bring it to the attention of the jury. When evidence with such recognized potential for prejudice permeates the trial to the extent it did here, the possibility of prejudice remains high despite the trial court's efforts to reduce it. When the potential prejudice is the result of a party's deliberate strategy, in clear violation of rules of evidence and a court's orders, any substantial doubt about the effectiveness of curative instructions should be resolved in favor of the disadvantaged party in order to protect the integrity of the judicial process.

¶ 57 In *Finley,* the defendant "purposefully brought up the subject of [plaintiff's] pension [, a collateral source payment,] three different times during his fifteen minute opening argument." 1 F.Supp.2d at 444. The *Finley* court acknowledged that defendant's counsel "clearly intended to bring the fact of [plaintiffs] pension to the jury's attention; indeed, it was a dominant theme running throughout the opening statement." *Id.* It then concluded that a curative instruction could not cure the prejudice the plaintiff suffered as a result of defendant's collateral source references. *Id.* at 444–45.

¶ 58 We similarly conclude in this case that IHC's references to collateral source evidence did not arise from either mistake or inadvertence. Rather, IHC's references to collateral source evidence were deliberate, persisted in the face of the Wilsons' repeated objections, and flaunted the court's in limine order putting the subject out of bounds. IHC made a strategic decision to raise the collateral source evidence as a " dominant theme running" throughout the trial. We refuse to condone IHC's behavior by ruling that the jury instructions given at the close of trial cured the prejudice to the Wilsons.

*D. The Wilsons Neither Waived Their Objection to IHC's Collateral Source References nor Invited the Error Committed by the Trial Court*

¶ 59 IHC argues that the Wilsons have forfeited their right to challenge its collateral source references on appeal in two ways. First, IHC argues that the Wilsons waived any challenge to the collateral source evidence by stipulating that they had incurred no out-of-pocket expenses and by developing, through their own witnesses, targeted testimony regarding collateral source benefits. Second, IHC claims that the Wilsons invited the trial court's error by suggesting that any false impression arising from the reference to out-of-pocket expenses could be cured. We disagree.

1. The Wilsons Did not Waive Their Objection to IHC's Improper Collateral Source References

¶ 60 IHC argues that the Wilsons waived any claim of error by stipulating that they had incurred no out-of-pocket expenses and by soliciting from their own witnesses the most targeted statements of collateral source evidence. The Wilsons maintain that their references to collateral source evidence were merely an attempt to mitigate the prejudice arising from the collateral source evidence introduced by IHC. Specifically, they argue that IHC's violation of the collateral source rule forced them to explain why, despite receipt of collateral source benefits, they still suffered economic damages. We agree and hold that the Wilsons' attempt to mitigate the prejudice caused by IHC's collateral source references does not deprive the Wilsons of their ability to raise the issue on appeal.

¶ 61 "Waiver is an intentional relinquishment of a known right." *Meadow Valley Contractors, Inc. v. State Dep't of Transp.,* 2011 UT 35, ¶ 45, 266 P.3d 671 (internal quotation marks omitted). It requires three elements: "(1) an existing right, benefit, or advantage; (2) knowledge of its existence; and (3) an intention to relinquish the right." *Soter's, Inc. v. Deseret Fed. Sav. & Loan Ass'n,* 857 P.2d 935, 940 (Utah 1993). The issue of intent is "the central focus in most waiver cases and is the cause of the problem we address today." *Id.*

¶ 62 "[T]he intent to relinquish a right must be distinct," *id.* at 942, "although

it may be expressed or implied," *Meadow Valley Contractors*, 2011 UT 35, ¶ 45, 266 P.3d 671 (internal quotation marks omitted). A party does not evince a distinct intent to waive his objection to improperly admitted evidence by attempting to ameliorate the damage caused by that evidence. *See State v. Saunders*, 1999 UT 59, ¶ 24, 992 P.2d 951 ("It would be unfair for [one party] to question a witness on prohibited information or issues, but then require the [opposing party] to forego cross-examination, which could ameliorate the damage caused, to preserve an objection to the . . . misconduct." (internal quotation marks omitted)).[18]

¶ 63 IHC argues that the Wilsons waived their right to object to collateral source evidence. Specifically, IHC contends that the Wilsons "stipulated to the absence of out-of-pocket expenses in front of the jury." But IHC's characterization of the Wilsons' stipulation is grossly out-of-context and borders on misleading. IHC's brief inaccurately suggests that the Wilsons entered the stipulation prior to any collateral source references by IHC and without regard to such references. The record clarifies, however, that the Wilsons entered the stipulation to mitigate damage caused by IHC's collateral source references.

¶ 64 The Wilsons called Mr. Wilson, Jared's father, as their first witness. During cross-examination, IHC asked Mr. Wilson five different questions designed to highlight the lack of any out-of-pocket expenses incurred by the Wilsons in providing care for Jared. The Wilsons objected to IHC's third question as a "direct violation of [the] Court's order."

¶ 65 Upon receiving the objection, the trial court held a bench conference outside the presence of the jury. During the conference, the Wilsons stipulated that they were not claiming out-of-pocket expenses. The trial court acknowledged that the stipulation made out-of-pocket expenses "irrelevant" and that there would be no claim for them. At the end of the conference, IHC told the court that it needed to ask Mr. Wilson if out-of-pocket expenses would be a claim. The trial court permitted the question even though the stipulation had rendered it irrelevant.

¶ 66 IHC then asked Mr. Wilson "in your deposition, you indicated that your out-of-pocket expenses were minimal. Is that correct?" The Wilsons again objected, reiterating that their stipulation rendered evidence regarding the amount of out-of-pocket expenses irrelevant. Nevertheless, the trial court permitted IHC to continue its questioning. In addition to their objections, the Wilsons moved for a mistrial. The motion was based on several grounds, including that "[t]he collateral source rule, which the Court rule[d on] in response to our motion in limine . . . . was blatantly violated."

¶ 67 In context, the Wilsons' stipulation and motion for mistrial do not evince an unequivocal intent to waive their right to appeal the admission of the collateral source

---

18. *See also Stong v. Freeman Truck Line, Inc.*, 456 So.2d 698, 711 (Miss.1984) ("When the trial judge makes a ruling adverse to a litigant, and where that litigant's lawyer has properly noted his objection, that litigant and his lawyer are entitled to try the rest of the case on the assumption that the trial judge's ruling will not be disturbed on appeal. And, when that litigant reaches this Court we will not imply a waiver from the subsequent conduct which does nothing more than show the lawyer's obligatory respect for the trial judge while at the same time continuing as best can be done [for] the advancement of his client's cause."); *McCathern v. Toyota Motor Corp.*, 332 Or. 59, 23 P.3d 320, 327 (2001) ("A party has the right to meet its opponent's evidence admitted under the trial court's rulings. After making the proper objections, a party may counter its opponent's evidence, whether correctly admitted or not, without waiving its evidentiary objection on appeal."); *Scurlock Oil Co. v. Smithwick*, 724 S.W.2d 1, 4 (Tex.1986) ("Having properly objected, [defendant] was not required to sit idly by and take its chances on appeal or retrial when incompetent evidence was admitted. [Defendant] was entitled to defend itself by explaining, rebutting, or demonstrating the untruthfulness of the objectionable evidence without waiving its objection." (citation omitted)); KENNETH S. BROUN ET AL, MCCORMICK ON EVIDENCE, § 55 (6th ed. 2006) ("[W]hen his objection is made and overruled, he is entitled to treat this ruling as the 'law of the trial' and to negatively rebut or explain, if he can, the evidence admitted over his protest. Consequently, there is no waiver if he cross-examines the adversary's witness about the matter. There is no waiver even though the cross-examination entails a repetition of the fact, or even if he meets the testimony with other evidence which, under the theory of his objection, would be inadmissible." (citations omitted)).

evidence. Contrary to the suggestion in IHC's brief, the Wilsons had not claimed any out-of-pocket expenses in the first place and entered into the stipulation only after IHC had made three references to the lack of any out-of-pocket expenses. And in the colloquy between the trial court and counsel following the stipulation, the Wilsons emphasized that the purpose of the stipulation was to render any testimony on the subject irrelevant. The Wilsons' argument illustrates that they entered the stipulation to minimize the impact of IHC's improper references to out-of-pocket expenses. The Wilsons' strategic decision to attempt to mitigate the damage arising from improperly admitted evidence does not reflect an intent to waive their right to appeal the admission of that evidence. The Wilsons' lack of intent to waive is further supported by their repeated objections and their decision to request a mistrial based, in part, on the erroneous admission of collateral source evidence.

¶ 68 IHC also complains that the Wilsons solicited the most targeted collateral source evidence from their own witnesses. IHC points to the following exchange between Mr. Wilson and the Wilson's counsel:

Q. (by the WILSONS' COUNSEL): Have the bulk of Jared's medical expenses been paid by health insurance or Medicaid?

A. (by JEROME WILSON): Yes.

According to IHC's brief, this targeted exchange occurred on the "first day of evidence" during "examination" of the trial's first witness by the Wilsons' own counsel. Thus, IHC suggests that the Wilsons introduced targeted collateral source evidence prior to any reference by IHC. But this is simply untrue. Rather, the Wilsons' counsel asked Mr. Wilson this question on the second day of evidence during redirect examination in order to rebut IHC's suggestion that the Wilsons were improperly seeking a double recovery. The question prompted the trial court to initiate a bench conference. During the conference, the Wilsons' counsel emphasized that IHC's references to out-of-pocket expenses had created a "false impression" that the Wilsons had not suffered any damages. The Wilsons also argued that they needed to examine witnesses regarding collateral source benefits and liens held by private health insurers and Medicaid to correct this false impression.

¶ 69 In summary, the targeted question to Mr. Wilson occurred after IHC's numerous collateral source references. And the Wilsons' arguments during the bench conference illustrate that the question was intended to mitigate the damage caused by IHC's violation of the in limine order. We therefore hold that the Wilsons' attempt to ameliorate the prejudice caused by IHC does not evince an unequivocal intent to waive their objection to the improperly admitted collateral source evidence.[19] *Id.*

2. The Wilsons Did not Invite Error by Attempting to Mitigate Prejudice Caused by IHC's Improper Collateral Source References

¶ 70 IHC also contends that the Wilsons' collateral source rule claim is barred by the invited error doctrine. Specifically, IHC claims that the Wilsons invited error by agreeing that any false impression concerning out-of-pocket expenses could be cured. As previously discussed, IHC's repeated references to the Wilsons' lack of out-of-pocket costs suggested to the jury that the Wilsons were seeking to obtain a double recovery. In response to this implication, the Wilsons suggested that the trial court advise the jury of the liens that collateral sources held against any judgment. We disagree with IHCs contention that such a suggestion invited any error.

¶ 71 "Our invited error doctrine arises from the principle that a party cannot take advantage of an error committed at trial when that party led the trial court into committing the error." *Pratt v. Nelson*, 2007 UT

---

19. IHC notes a second instance where the Wilsons "injected other specific collateral source evidence" into the trial. Specifically, the Wilsons' counsel asked Ms. Fox "[i]s the $8,000 a year provided [by DSPD] paid to the Wilsons or is it paid to the people that come in to help." This question does not change our decision. The Wilsons were entitled to ask the question to mitigate the damage caused by IHC's references to out-of-pocket expenses.

41, ¶17, 164 P.3d 366 (internal quotation marks omitted). Generally, a party invites error when "counsel, either by statement or act, affirmatively represent[s] to the [trial] court that he or she had no objection to the [proceedings]." *Butterfield v. Sevier Valley Hosp.*, 2010 UT App 357, ¶ 23, 246 P.3d 120 (second and third alteration in original) (internal quotation marks omitted). But a party does not invite error when it responds to an error committed by the opposing party. *See State v. Palenkas*, 188 Ariz. 201, 933 P.2d 1269, 1278 (Ariz.Ct.App.1996) ("Likewise, in this case, defendant's testimony on direct examination did not 'invite' error; it merely responded to it. His testimony about his attempts to contact his attorney was necessary to explain the state's prior evidence elicited, in violation of the in limine orders, of his refusal to consent to a search.").[20]

■ ¶ 72 The invited error doctrine serves two policy goals. First, the doctrine "discourag[es] parties from intentionally misleading the trial court so as to preserve a hidden ground for reversal on appeal." *Pratt*, 2007 UT 41, ¶ 17, 164 P.3d 366 (internal quotation marks omitted). Second, the doctrine "[e]ncourag[es] counsel to actively participate in all proceedings and to raise any possible error at the time of its occurrence," and thereby "fortifies our long-established policy that the trial court should have the first opportunity to address a claim of error." *Id.* (first alteration in original) (internal quotation marks omitted).

■ ¶ 73 IHC correctly notes that the Wilsons agreed that "any false impression concerning the absence of out-of-pocket expenses . . . would be resolved by advising the jury of liens against any judgment [held] by Medicaid and insurers." The Wilsons made two statements to this effect. The first occurred during a bench conference. During the conference, the Wilsons explained that

IHC's collateral source references created a "false impression" that they had not suffered damages. In response to the Wilsons' contention, the trial court stated "the false impression is going to be resolved" with the presentation of evidence about liens held on the Wilsons' recovery. The Wilsons replied "[t]hat's fine. If we can present it through the Blue Cross and Medicaid people, then that's fine."

¶ 74 The Wilsons made a similar statement the following day. Again, the statement was made during a bench conference discussing the propriety of IHC's out-of-pocket expense references. The trial court permitted IHC to ask "[w]hat [the Wilsons] would have to pay themselves, personally." The Wilsons responded "[t]hen we have introduced insurance, which, as I indicated yesterday, I'm willing to do, but it's got to be the whole package."

¶ 75 IHC argues that these statements invited any error that may have been committed by the trial court. But, once again, IHC takes the record out of context.

¶ 76 The Wilsons did not invite error because their agreement to enter lien evidence was made after and was, in fact, in response to improper collateral source evidence introduced by IHC. The Wilsons first agreed to the introduction of lien evidence during the redirect examination of their first witness, Mr. Wilson, after IHC had already made five references to out-of-pocket expenses during cross-examination. IHC's references violated the trial court's in limine order and the Wilsons duly objected. Despite the Wilsons' objections, the trial court continued to permit IHC to make collateral source references. It was at this time, after IHC had introduced significant error into the trial, that the Wilsons agreed to introduction of lien evidence in an effort to mitigate the damage caused by IHC. It is well-established that "a party does

---

20. *See also Mary M. v. City of Los Angeles*, 54 Cal.3d 202, 285 Cal.Rptr. 99, 814 P.2d 1341, 1346 (1991) ("An attorney who submits to the authority of an erroneous, adverse ruling after making appropriate objections or motions, does not [invite] the error in the ruling by proceeding in accordance therewith and endeavoring to make the best of a bad situation for which he was not responsible." (internal quotation marks

omitted)); *State v. Pizzillo*, No. 746, 2002 WL 75936, at *8 (Ohio Ct.App. Jan. 17, 2002) (noting that defense counsel did not invite error when he was merely responding to inadmissible testimony that was elicited by the prosecution); 21 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 5039.2 (2d ed. 2005) ("[A] party does not 'invite error' by attempting to ameliorate the opponent's violation of a motion in limine.").

not 'invite error' by attempting to ameliorate the opponent's violation of a motion in limine." [21] 21 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 5039.2 (2d ed. 2005).

▇ ¶ 77 We also note that application of the invited error doctrine in this case would not advance the policies supporting it. The doctrine is intended to prevent parties from "misleading the trial court so as to preserve a hidden ground for reversal on appeal" and to encourage parties to "raise any possible error at the time of its occurrence," thereby providing the trial court with "the first opportunity to address a claim of error." *Pratt*, 2007 UT 41, ¶ 17, 164 P.3d 366. Prior to agreeing to enter evidence of collateral source liens, the Wilsons filed a successful pre-trial motion in limine to exclude collateral source evidence and made objections to enforce the in limine order. As a result, the trial court was fully aware of the Wilsons' collateral source objection and had ample opportunity to address the Wilsons' claim of error. Under these circumstances, application of the invited error doctrine would not further the policy goals of that doctrine.

¶ 78 In summary, the Wilsons received collateral source benefits "to or for the benefit of Jared" from both private health insurance and public benefit programs. IHC made persistent and deliberate references to these benefits throughout the trial of this case. We hold that IHC's remarks violated the collateral source rule, disregarded the trial court's in limine order, and substantially prejudiced the Wilsons by erroneously suggesting to the jury that they were seeking to obtain a double recovery. We also conclude that the trial court's jury instructions, delivered after closing, came too late to cure the prejudice resulting from IHC's "persistent and studied attempts" to place collateral source evidence before the jury. Finally, contrary to IHC's claim, we hold that the Wilsons neither waived their challenge to collateral source evidence nor invited the trial court's error when they attempted to mitigate the prejudice caused by IHC's remarks.

Accordingly, we vacate the jury's verdict and remand this case for a new trial.

## II. GUIDANCE FOR THE TRIAL COURT ON REMAND

¶ 79 IHC and the Wilsons raise several other issues on appeal. Because these issues will likely arise again on remand, we address them here to assist the trial court. UTAH R.APP. P. 30(a) ("If a new trial is granted, the court may pass upon and determine all questions of law involved in the case presented upon the appeal and necessary to the final determination of the case."); *see also State v. James*, 819 P.2d 781, 795 (Utah 1991) ("Issues that are fully briefed on appeal and are likely to be presented on remand should be addressed by this court."). We note, however, that by addressing these issues, "we do not intend to suggest that the trial court is precluded from making different findings of fact or conclusions of law during remand." *Stonehocker v. Stonehocker*, 2008 UT App 11, ¶ 24, 176 P.3d 476.

¶ 80 We address the following three issues: (1) whether IHC's ex parte meetings with Jared's treating physicians were improper and prejudicial, (2) whether the trial court erred in excluding IHC's nurse training modules from evidence, and (3) whether the trial court erred in admitting the Hospital's neonatal morbidity and mortality statistics.

*A. IHC's Ex Parte Meeting with Dr. Boyer, a Physician It Did not Employ, Was Improper, but Its Ex Parte Meetings with Physicians It Employed Were Proper*

¶ 81 We first consider whether it was appropriate for IHC's counsel to meet ex parte with Jared's treating physicians. During the course of this litigation, IHC's counsel met ex parte with Dr. Boyer, a physician it did not employ. IHC's counsel also met ex parte with Dr. Stoddard, Dr. Clark, and Dr. Minton, three physicians it employed (Employed

---

21. On these facts, we apply the invited error doctrine in a manner similar to our waiver doctrine. That is, we permit a party to respond to

opposing counsel's errors without inviting error or waiving their right to appeal the issue.

Physicians).[22]  On appeal, the Wilsons argue that these physicians violated their ethical duty of confidentiality to Jared by participating in the meetings.  The Wilsons also claim that the physicians changed their opinions regarding Jared's medical conditions as a result of the ex parte meetings.  IHC replies that its ex parte meetings were "reasonably understood as appropriate under the state of the law at the time."

¶ 82  We address the permissibility of IHC's ex parte meetings with Dr. Boyer and the Employed Physicians separately.  We conclude that it was improper for IHC to meet ex parte with Dr. Boyer without first notifying and obtaining consent from the Wilsons.  But we hold that IHC's ex parte meetings with the Employed Physicians were permissible because the Wilsons were attempting to hold IHC vicariously liable for the physicians' conduct.

1.  IHC's Ex Parte Meeting with Dr. Boyer Was Improper

■■ ¶ 83  We now turn to the issue of whether IHC's ex parte meeting with Dr. Boyer, who IHC did not employ, was permissible.  The Wilsons contend that, by meeting ex parte with IHC's counsel, Dr. Boyer violated his fiduciary duty of confidentiality to Jared under *Debry v. Goates*, 2000 UT App 58, 999 P.2d 582 and *Sorensen v. Barbuto*, 2008 UT 8, 177 P.3d 614.  IHC disagrees.  It argues that the ex parte meeting was permissible under the law in effect in April 2003, the date of the meeting.  In support of its position, IHC points to rule 506 of the Utah Rules of Evidence, section 78B–1–137 of the

Utah Code,[23] a Utah State Bar Ethics Advisory Opinion,[24] and an April 10, 2000 order issued by the Fourth District Court.[25]  IHC also argues that *Debry* did not put IHC on notice that its ex parte meeting with Dr. Boyer was improper.

■■■ ¶ 84  A physician is bound by both a duty to preserve the "physician-patient testimonial privilege" and a "healthcare fiduciary duty of confidentiality." *Sorensen*, 2008 UT 8, ¶¶ 11, 16, 177 P.3d 614.  "These two zones of protection for patient records and disclosures are not coextensive, even though they often overlap." *Id.* ¶ 11.  The physician-patient testimonial privilege is restricted to court proceedings, while the duty of confidentiality "serves a broader purpose." *Id.*  Rule 506 of the Utah Rules of Evidence establishes the physician-patient privilege.  It grants patients a privilege for communications with their physician that relate to "diagnoses made, treatment provided, or advice given by [the] physician." UTAH R. EVID. 506(b)(1).  But the patient-physician privilege is not absolute.  No privilege exists when the "communications [are] relevant to an issue of the physical, mental, or emotional condition of the patient ... in any proceeding in which that condition is an element of any claim or defense." *Id.* 506(d)(1)(A).

■■■ ¶ 85  In contrast, "[a] physician's duty of confidentiality encompasses the broad principle that prohibits a physician from disclosing information received through the physician-patient relationship." *Sorensen*, 2008 UT 8, ¶ 12, 177 P.3d 614.  The duty

**22.**  IHC argues that "the appeal of this issue as to Dr. Clark is moot .... [because] Dr. Clark was never called to testify."  IHC also argues that "the appeal of this issue as to Dr. Minton is ... moot" because the trial court found that Dr. Minton's treatment of Jared "was not within the scope of care placed at issue."  Even if IHC is correct, it is still necessary for us to address the propriety of IHC's meetings with the Employed Physicians because of IHC's ex parte meetings with Dr. Stoddard.

**23.**  We decline to address IHC's statutory argument because Utah appellate courts have twice held that rule 506 of the Utah Rules of Evidence supersedes section 78B–1–137(4). *Sorensen v. Barbuto*, 2008 UT 8, ¶ 8, 177 P.3d 614; *Debry v. Goates*, 2000 UT App 58, ¶ 24 n. 2, 999 P.2d 582.

**24.**  UTAH STATE BAR ETHICS ADVISORY OP 99–03 (1999).

**25.**  The trial court admitted into evidence an April 10, 2000 order issued by the Fourth District Court in an unrelated proceeding.  That order permitted defense counsel to conduct ex parte meetings with a plaintiff's treating physicians, regardless of the employment relation ship between the defendant and the physician.  The order contradicts the rule announced in *Debry*, 2000 UT App 58, ¶ 28, 999 P.2d 582, on March 9, 2000.  Because the Fourth District Court's order conflicts with a published court of appeals decision, the trial court erred when it admitted the order.

requires a physician to notify the patient prior to "'disclosing confidential records or communications in a subsequent litigation.'" *Id.* ¶ 16 (quoting *Debry*, 2000 UT App 58, ¶ 28, 999 P.2d 582). The physician's duty applies even if the communications qualify for rule 506(d)(1)'s exception to the patient-physician privilege.[26] *Id.*

¶ 86 In *Sorensen*, we specifically considered whether a treating physician's ex parte communications with opposing counsel violated the healthcare duty of confidentiality. *Id.* ¶ 18. We held that "Dr. Barbuto's ex parte communications with opposing counsel in Sorensen's personal injury action [were] a violation of Dr. Barbuto's healthcare fiduciary duty of confidentiality." *Id.* ¶ 25. In reaching this conclusion, we emphasized that our holding did not foreclose opposing counsel "from obtaining relevant medical information from a treating physician." *Id.* ¶ 24. We noted that "[s]uch information may still be obtained through traditional forms of formal discovery." *Id.*

¶ 87 In *Sorensen*, we identified two policy rationales supporting the requirement that a plaintiff's physician provide notice to the plaintiff before meeting ex parte with defense counsel. *Id.* ¶ 21. First, we reasoned that preventing ex parte communications without prior notice would protect the patient-physician relationship by providing the patient with "assurance that their candid responses to questions important to determining their appropriate medical treatment would remain confidential." *Id.* ¶ 22. Second, we acknowledged that "permitting ex parte communications between a treating physician and an opposing counsel would make it impossible for a patient or a court to appropriately monitor the scope of the physician's disclosures." *Id.* ¶ 23. Monitoring the scope of communications between a treating physician and opposing counsel is important because

[a]n unauthorized ex parte interview could disintegrate into a discussion of the impact of a jury's award upon a physician's professional reputation, the rising cost of malpractice insurance premiums, the notion that the treating physician might be the next person to be sued, and other topics which might influence the treating physician's views.

*Manion v. N.P.W. Med. Ctr. of N.E. Pa., Inc.*, 676 F.Supp. 585, 594–95 (M.D.Penn. 1987) (emphasis omitted).

¶ 88 In this case, Dr. Boyer, who was not an IHC employee, failed to provide Jared with notice prior to meeting ex parte with IHC's counsel. As a result, Dr. Boyer violated his fiduciary duty of confidentiality.

¶ 89 IHC argues that we should not apply our *Sorensen* decision, which was announced in 2008, to its ex parte meeting with Dr. Boyer, which occurred in April 2003. IHC contends that our decision should instead be governed by a Utah State Bar Ethics Advisory Opinion, which was approved by the Ethics Advisory Committee in May 1999.[27] UTAH STATE BAR ETHICS ADVISORY OP. 99–03 (1999). That opinion held that "[n]o ethical rule prohibits ex parte contact with plaintiff's treating physician when plaintiff's physical condition is at issue."[28] *Id.* On rehearing, the committee specifically acknowledged that "[o]nce the Utah courts or the Utah Legislature has spoken definitively, we can follow their lead. Until then, however, we find no clearly applicable Utah judicial decision, statute or Rule of Professional Conduct that prohibits ex parte contact between defense counsel and a treating physician." UTAH STATE BAR ETHICS ADVISORY OP. 99–03R (1999).

¶ 90 We are unpersuaded by IHC's argument because the court of appeals' March 2000 decision in *Debry* superseded Opinion 99–03R and filled the gap identified by the Ethics Advisory Committee. IHC

---

26. The requirements of the physician's duty of confidentiality, as discussed in paragraphs 85–88, apply to physicians *who are not* employed by a defendant-hospital. A different rule applies to physicians *who are* employed by a defendant-hospital, as discussed in paragraphs 95–103.

27. The Ethics Advisory Committee affirmed its opinion on rehearing in October 1999. UTAH STATE BAR ETHICS ADVISORY OPINION OP. 99–03R (1999).

28. *Sorensen* vacated Opinion 99–03 in 2008. 2008 UT 8, ¶ 27, 177 P.3d 614.

contends that the holding in *Debry* should be limited to its narrow facts. But our decision in *Sorensen* clearly holds otherwise. In *Sorensen*, we stated "at the time the ex parte communications took place in this case, Utah law under *Debry* already required physicians to provide notification prior to providing medical information as part of a judicial proceeding." [29] *Sorensen*, 2008 UT 8, ¶ 28, 177 P.3d 614. Accordingly, we hold that when IHC met ex parte with Dr. Boyer in April 2003, *Debry*, not Opinion 99–03R, governed. And according to *Debry*, Dr. Boyer was required to provide the Wilsons with reasonable notice before communicating ex parte with IHC regarding his treatment of Jared. By failing to do so, Dr. Boyer violated his healthcare fiduciary duty of confidentiality to Jared.[30]

¶ 91 This case raises the related question of what duties opposing counsel has if she wants to meet ex parte with a plaintiffs treating physician. This question was not directly addressed in either *Sorensen* or *Debry*. Rather, both cases involved a direct lawsuit alleging that either a doctor or therapist had breached the duty of confidentiality to their patient during an underlying lawsuit. But the holdings of *Sorensen* and *Debry* implied that opposing counsel has a duty in the underlying lawsuit to neither instigate nor facilitate a treating physician's breach of the duty of confidentiality to his patient through an improper ex parte meeting. *See id.* ¶ 23; *Debry*, 2000 UT App 58, ¶¶ 27–28,

999 P.2d 582. This duty exists because opposing counsel has interests adverse to the patient. *See Sorensen*, 2008 UT 8, ¶ 23, 177 P.3d 614. And "[a] physician is likely not trained to know what information can be disclosed as covered by a patient's rule 506(d)(1) waiver of privilege and what information remains protected by the healthcare fiduciary duty of confidentiality." *Id.* Thus, this rule seeks to prevent counsel from improperly encouraging a treating physician to disclose protected confidential information.

¶ 92 In this case, Dr. Boyer incorrectly thought that he could meet ex parte with IHC's counsel without first notifying Jared based on his "accumulated body of understanding from visiting with attorneys." IHC's counsel met with Dr. Boyer and participated in Dr. Boyer's breach of the duty of confidentiality by failing to correct his misunderstanding of the law. By so doing, IHC's counsel breached its duty to refrain from conducting improper ex parte meetings and by encouraging disclosure of confidential information. While we recognize that IHC breached its duty, the record does not reveal in any detail the circumstances of the breach. For instance, we do not know who initiated the ex parte meeting between IHCs counsel and Dr. Boyer.

¶ 93 Having determined that IHC acted improperly to some degree, we next consider the appropriate sanction.[31]

---

29. IHC argues that *Debry* was not extended to cover ex parte meetings with treating physicians until the court of appeals decision in *Sorensen v. Barbuto*, 2006 UT App 340, 143 P.3d 295. Our decision in *Sorensen*, which affirmed the court of appeals, is inconsistent with this position because it held that *Debry* "required physicians to provide notification prior to providing medical information as part of a judicial proceeding." *Sorensen*, 2008 UT 8, ¶ 28, 177 P.3d 614.

30. On cross-appeal, IHC asserts that a portion of Jury Instruction No. 39 is erroneous. IHC's claim relates to the last paragraph of Instruction No. 39, which states "[a] physician has the duty to protect their patient's confidential information. Since at least March 2000, Utah law has required a physician to notify his patient before disclosing confidential records or communications to the patient's adversary in litigation." IHC argues that Instruction No. 39 is incorrect as a matter of law with respect to its ex parte

meeting with Dr. Boyer. IHC is incorrect. As we have articulated, the court of appeals' decision in *Debry* required a treating physician to provide notice to his patient prior to meeting ex parte with defense counsel. *Sorensen*, 2008 UT 8, ¶ 28, 177 P.3d 614. The court of appeals issued *Debry* in March 2000. *Debry*, 2000 UT App 58, 999 P.2d 582. We accordingly deny IHC's cross-appeal and hold that Jury Instruction No. 39 correctly stated the law with respect to Dr. Boyer.

31. IHC argues that any error associated with admission of Dr. Boyer's testimony was harmless. Specifically, IHC argues that "Dr. Boyer's testimony did not affect the verdict because the jury never reached causation." We disagree. We have reversed and remanded for a new trial on the independent ground that IHC violated the collateral source rule. *Supra* ¶ 78. And Dr. Boyer may testify on retrial. Accordingly, IHC may not avail itself of the harmless error rule.

The Wilsons ask that, on remand, we prohibit Dr. Boyer from testifying regarding Jared's medical condition and exclude from evidence any changes he made to Jared's medical records after his ex parte meeting with IHC's counsel.

¶ 94 Selection of an appropriate sanction requires fact-finding combined with the exercise of discretion. Such a decision is best made in the first instance by a trial court. Accordingly, we decline to sanction IHC and instead grant leave to the trial court to consider on remand whether sanctions are appropriate. In doing so, the trial court should consider argument from the parties regarding available and appropriate sanctions. In deciding whether sanctions are appropriate and the nature of any sanction it may impose, the court should consider, among other things, the willfulness of counsel's conduct; the degree to which its impropriety was apparent at the time; the likelihood that evidence or testimony was altered as a result of the meeting; the prejudice to the opposing party; and the detrimental effect of the ex parte contact on the trial and the judicial process. Upon hearing from the parties, completing its fact-finding, and assessing the extent of IHC's breach of duty, the trial court may exercise its "inherent power" and levy sanctions. *Griffith v. Griffith*, 1999 UT 78, ¶ 13, 985 P.2d 255 ("The summary jurisdiction which the court has over its attorneys as officers of the court . . . is inherent, continuing, and plenary . . . and ought to be assumed and exercised . . . not only to maintain and protect the integrity and dignity of the court, to secure obedience to its rules and process, and to rebuke interference with the conduct of its business, but also to control and protect its officers, including attorneys." (alterations in original) (quoting *In re Evans*, 42 Utah 282, 130 P. 217, 224–25 (1913))); *see also* UTAH CODE § 78A–2–201(5) ("Every court has authority to . . . control in furtherance of justice the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it in every matter . . . ."); *id.* § 78A–2–201(3) ("Every court has authority to . . . provide for the orderly conduct of proceedings before it or its officers . . . ."). The sanctions to be considered may include fines, attorney fees, exclusion of evidence, disqualification of counsel, or any other appropriate response, but the court should be careful to ensure that any sanction is appropriately related to the nature of the misconduct and the resulting prejudice, either actual or potential. *Featherstone v. Schaerrer*, 2001 UT 86, ¶ 16, 34 P.3d 194 ("The inherent power of a court to regulate those practicing before it also encompasses the authority to enforce its regulation through appropriate means, such as by levying monetary sanctions, excluding evidence, or disqualifying counsel from a case."); *see also Harlan v. Lewis*, 141 F.R.D. 107, 113–14 (E.D.Ark.1992) (levying sanctions for improper ex parte meetings including a fine and requiring that, "if the defendant intends to use treating physicians as expert witnesses, defense counsel must turn over to plaintiff's counsel all notes, records, transcripts and recordings of ex parte interviews" (emphasis omitted)), *aff'd*, 982 F.2d 1255 (8th Cir.1993); *Manion*, 676 F.Supp. at 596 (excluding physician testimony where the physician failed to notify the patient prior to ex parte contact with opposing counsel).

2. IHC's Ex Parte Communications with Its Employed Physicians Were Proper Because Its Alleged Liability Derives From Their Conduct

¶ 95 We next consider whether IHC's ex parte meetings with its Employed Physicians were appropriate under our decision in *Sorensen*. IHC contends that *Sorensen* does not prohibit ex parte communications between a physician and his hospital-employer if a plaintiff alleges the hospital is vicariously liable for the physician's conduct. The Wilsons reply that carving a vicarious liability exception out of *Sorensen* would contradict the policies underlying that decision, which include preservation of the patient-physician relationship and regulation of a treating physician's disclosures to opposing counsel. We agree with IHC.

¶ 96 We start by addressing the source of IHC's alleged liability in this case. The Wilsons argue that they did not seek to hold IHC vicariously liable for the Employed Physician's conduct. But the broad language of

their complaint suggests otherwise. The complaint alleges "the nurses, agents and employees of the hospital were negligent in the services that they provided to plaintiff Jared Wilson, and that those services provided by defendants' agents were below. the standard of care." The Employed Physicians fall within the scope of this broad language.

¶ 97 Because of its potential liability for their conduct, IHC may permissibly meet ex parte with the Employed Physicians. A hospital has the right to defend itself and may communicate with its employees to determine the extent of its vicarious liability for their conduct.[32] *Aylward v. Settecase*, 409 Ill.App.3d 831, 350 Ill.Dec. 489, 948 N.E.2d 769, 772 (2011). Where "a plaintiff attempts to hold a hospital liable for the conduct of its own physician-employees, 'the defendant hospital is included within the physician-patient privilege and the patient has impliedly consented to the release of his medical information to the defendant hospital's attorneys.' " *Id.*, 350 Ill.Dec. 489, 948 N.E.2d at 773 (quoting *Morgan v. Cnty. of Cook*, 252 Ill.App.3d 947, 192 Ill.Dec. 176, 625 N.E.2d 136, 140 (1993)). Similarly, the patient has impliedly consented to allow a physician to share information protected by the duty of confidentiality with his hospital-employer.

¶ 98 Permitting disclosure to a hospital-employer conforms with the settled expectations of patients. While the public correctly expects that information disclosed to a physician will not be shared with third parties absent legal process, they do not have a similar expectation with respect to information shared between a physician and his hospital-employer. Because the patient has impliedly consented to disclosure and disclosure does not violate the settled expectations of patients, ex parte meetings with the Employed Physicians do not implicate the policy

concerns we identified in *Sorensen*. Likewise, such meetings do not require prior notice to the patient. Thus, we hold that IHC's ex parte meetings with the Employed Physicians were permissible to the extent that the Wilsons sought to hold IHC vicariously liable for the Employed Physicians' conduct.[33]

¶ 99 The Wilsons also argue that permitting Jared's treating physicians to testify on behalf of IHC damages their credibility and prejudices their case. They assert that *Sorensen* created a per se rule that prohibits a physician from testifying for a patient's adversaries. In support of their position, the Wilsons cite a footnote in *Sorensen* that states "[a] physician's ability to act as an expert for a patient's antagonist in litigation is … limited" by his obligation to protect confidential medical information. *Sorensen*, 2008 UT 8, ¶ 24 n. 1, 177 P.3d 614.

¶ 100 The Wilsons read too much into the footnote. Immediately following the passage cited by the Wilsons, we state "[a] treating physician may still be called as a factual witness by a party opposing a patient in litigation." *Id.* Indeed, we go on to acknowledge that/ "[a]s part of that testimony, physicians are permitted to provide opinions regarding the medical information that has been released through rule 506(d)(1)." *Id.* In short, *Sorensen* does not support a per se rule preventing a treating physician from testifying as a fact witness on behalf of an opposing party.

¶ 101 We also reject the Wilsons' argument on practical grounds. We acknowledge that it may be damaging if Jared's treating physicians testify on behalf of IHC. But we refuse to fashion a rule that would prevent a treating physician from testifying for the defense merely because the doctor's

**32.** Because we hold that IHC permissibly met ex parte with its Employed Physicians, we need not address IHC's argument that the Wilsons waived any objection to ex parte meetings with the Employed Physicians.

**33.** Our holding raises the following related issues: (1) whether a hospital-employer may permissibly engage in ex parte communications with physicians whose conduct is not a basis for the hospital's liability, and (2) whether a hospital-employer may permissibly communicate ex parte with non-physician employees about pending litigation where the hospital-employer may be vicariously liable for the employee's conduct and where the hospital-employer is not alleged to be liable for the employee's conduct. Because these questions were not presented here, we express no opinion on them.

opinion is inconsistent with the plaintiff's legal theory. Doing so would "allow a patient to restrain a doctor who possesses the most relevant information and opinions" regarding the patient's medical treatment. *Orr v. Sievert,* 162 Ga.App. 677, 292 S.E.2d 548, 550 (1982).

¶ 102 Next, the Wilsons contend · that IHC's ex parte meetings improperly influenced Dr. Stoddard's expert opinion. Specifically, they argue that when Dr. Stoddard testified on the ninth day of trial, he had not established an opinion regarding the cause of Jared's brain injuries. Then, on the eighteenth day of trial, after meeting ex parte with IHC, Dr. Stoddard testified that "there's nothing to support" Jared's theory of causation. While troubling, this allegation is not sufficient to upset our holding because it raises only a circumstantial inference that IHC improperly influenced Dr. Stoddard. The Wilsons have not produced any direct evidence suggesting that IHC's counsel attempted to tamper with the substance of Dr. Stoddard's testimony through bribery, threats, coercion, or collusion. And the Wilsons retained the option of impeaching Dr. Stoddard by pointing out on cross-examination the ex parte meeting and subsequent change in testimony.[34]

¶ 103 In summary, IHC met ex parte with two categories of treating physicians, those it did not employ and those it did. IHC's ex parte meetings with Dr. Boyer, whom IHC did not employ, were improper. However, its ex parte meetings with the Employed Physicians were permissible to the extent that the Wilsons placed the conduct of the Employed Physicians at issue under a theory of vicarious liability.

### B. *The Trial Court Did not Abuse Its Discretion in Excluding IHC's Nurse Training Modules*

■ ¶ 104 We next consider whether the trial court abused its discretion when it re-

fused to admit IHC's nurse training modules (Training Modules) into evidence. The trial court determined that the Training Modules were authentic, but denied their admission due to a lack of foundation. On appeal, the Wilsons contend that evidence is admissible when it is authentic and relevant. The Wilsons claim that the foundation for evidence is sufficiently established whenever it is proven to be authentic and assert that the trial court acknowledged the authenticity and relevancy of the Training Modules. They therefore urge that the Training Modules should have been admitted. IHC responds that the Training Modules were not relevant because they applied to a different time period and to a different facility from the Hospital at issue here. We agree with IHC.

■ ¶ 105 The Wilsons correctly state the test for admissibility. But they misstate the relationship between foundation, authenticity, and relevance. Both authenticity and relevance are prerequisites to admissibility. UTAH R. EVID. 402 [35] ("Evidence which is not relevant is not admissible."); UTAH R. EVID. 901(a) ("The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."). "[F]oundation is simply a loose term for preliminary questions designed to establish that evidence is admissible." *United States v. Penaloza,* 648 F.3d 539, 547 (7th Cir.2011) (internal quotation marks omitted). While "courts often speak of laying 'the foundation' in the singular, in truth the proponent may have to lay multiple foundations. Thus, a single exhibit such as a letter might require authentication, best evidence, and hearsay foundations." KENNETH S. BROUN ET. AL, MCCORMICK ON EVIDENCE § 51 (6th ed. 2006). Similarly, the exhibit may require a rele-

---

**34.** Certainly in cases where evidence tampering can be established, sanctions would be appropriate. *Cf. Harlan v. Lewis,* 141 F.R.D. 107, 113–14 (E.D.Ark.1992) (levying sanctions against defense counsel after considering sworn testimony that defense counsel met ex parte with plaintiff's treating physician and threatened that the physician may be called as a witness, may be sued, and would determine the outcome of the case

with his testimony), *aff'd* 982 F.2d 1255 (8th Cir.1993).

**35.** Rules 104, 401, 402, 901, and 1004 of the Utah Rules of Evidence were amended in 2011. We refer here to the version of those rules in effect in 2008, at the time the parties tried this case.

vance foundation. *See* 22 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5166 (1978) ("[S]ometimes an item of evidence is irrelevant because the proponent has failed to prove a step in the line of proof; this is often described as ... an objection to the lack of 'foundation'") (citations omitted).[36]

¶ 106 The parties do not dispute the trial court's finding that the Training Modules were authentic. But the Wilsons incorrectly claim that the trial court also found the Training Modules were relevant. It did not. In considering the Training Modules, the trial court stated "I understand there's a low threshold for relevance, but I need to get through foundation. Respectfully, they're not received." Accordingly, we focus our analysis on whether the Training Modules had sufficient foundation to be relevant.

¶ 107 Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Utah R. Evid. 401. In some instances, an item of evidence does not become relevant until preliminary facts have been established. Utah R. Evid. 104(b) ("When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.") An item of evidence, therefore, may not become relevant if its proponent fails to prove the necessary preliminary facts.

¶ 108 Here, the Wilsons offered the Training Modules to show that IHC's nurses' "conduct was directly contrary to the Hospital's own written nursing protocols which required [it] to [n]otify [the] physician of presence of decelerations in [fetal heart rate] tracings." But the Training Modules appear on their face to be from Orem Community Hospital, not this Hospital. Moreover, Lisa Fullmer,

the IHC employee responsible for labor and delivery training, testified that, at the time Jared was born, training in the labor and delivery unit at the Hospital was conducted by video. Ms. Fullmer also stated that no training modules existed at the Hospital at the time of Jared's birth. In short, the Wilsons failed to establish that IHC used the Training Modules in the Labor and Delivery Unit at the Hospital. As a result, IHC did not establish the conditional facts required by rule 104(b) to lay the foundation necessary to link the Training Modules to the Wilsons' claims. We therefore hold that the trial court did not abuse its discretion by refusing to admit them as evidence of the nursing protocols in place at the Hospital.[37]

¶ 109 In the alternative, the Wilsons contend that the Training Modules provide "the best available evidence of IHC's 1995 nursing protocols and policies," and they "should have been received as secondary evidence." The Wilsons further claim that admission of the Training Modules would be consistent with the "concept" embodied in rule 1004 of the Utah Rules of Evidence. We disagree.

¶ 110 Rule 1004 specifies the circumstances under which a court may admit secondary evidence of the contents of a writing. The rule authorizes presentation of "other evidence" when an original writing is not obtainable. Utah R. Evid. 1004. But this rule does not apply here because the Wilsons failed to establish that training modules for the Hospital ever existed in the first place. In short, the Wilsons may not offer the Training Modules as "other evidence" absent proof that an "original" existed at the Hospital and is no longer available.

¶ 111 The trial court did not abuse its discretion by excluding the Training Modules as evidence of the Hospital's nursing protocols. To introduce the Training Modules for this purpose, the Wilsons needed to establish

---

36. *See, e.g., State v. Fedorowicz,* 2002 UT 67, ¶ 33, 52 P.3d 1194 (noting that plaintiff "laid the foundation requisite to establish the relevance of the testimony"); *Chapman v. Uintah Cnty.,* 2003 UT App 383, ¶¶ 29–30, 81 P.3d 761 (holding that the trial court properly excluded trial exhibits when the proponent of the evidence failed to lay suffi-

cient foundation to establish the exhibits' relevancy).

37. Our decision does not foreclose the Wilsons from offering the Training Modules for other appropriate purposes on remand.

the conditional fact that IHC used them in the Labor and Delivery Unit at the Hospital. The Wilsons failed to establish this conditional fact and, as a result, the Training Modules were properly excluded.

*C. The Hospital's Neonatal Morbidity and Mortality Statistics Are Privileged Under Section 26–25–1 of the Utah Code*

■ ¶ 112 During discovery, the Wilsons requested that IHC produce any information related to the outcome of preterm births at the Hospital. While IHC maintained neonatal morbidity and mortality statistics for the Hospital, it refused to produce them, claiming they were privileged under section 26–25–1 of the Utah Code. The trial court disagreed, ruling that these documents were not privileged. The trial court erred.

¶ 113 The Legislature has created a "care review privilege." The privilege authorizes "[a]ny person, health facility, or other organization" to provide enumerated "persons and entities" with the following information: "interviews," "reports," "statements," "memoranda," and "any other data relating to the condition and treatment of any person." UTAH CODE § 26–25–1(1)(a)–(f)(2001).[38] The enumerated "persons and entities" include "peer review committees" and "any health facility's in-house staff committee." *Id.* § 26–25–1(2)(e), (h). The peer review and in-house committees may only use the information they receive for two purposes. The information may be used for "study, with the purpose of reducing morbidity or mortality." *Id.* § 26–25–1(3)(a). Or it may be used for "the evaluation and improvement of hospital and health care rendered by hospitals, health facilities, or health care providers." *Id.* § 26–25–1(3)(b). When an enumerated "person or entity" complies with the statute, "[a]ll information, interviews, reports, statements, memoranda, or other data furnished by reason of [the Confidential Information Release] chapter, and any findings or conclusions resulting from those studies are privileged communications and are not subject to dis-

covery, use, or receipt in evidence in any legal proceeding." *Id.* § 26–25–3.

¶ 114 Utah courts have twice addressed the care review privilege. In *Benson v. I.H.C. Hospitals, Inc.*, 866 P.2d 537 (Utah 1993), we considered the scope of the care review privilege and held that it protects only those documents *"prepared specifically to be submitted for review purposes." Id.* at 540 (alteration in original). It does not extend to documents that *"might or could* be used in the review process." *Id.* (alteration in original). We warned that any broader reading of the rule would permit hospitals to argue that "all medical documents prepared by hospital personnel are created to improve health care rendered by a hospital" and are protected by the privilege. *Id.*

¶ 115 The court of appeals addressed the steps a party must take to establish the care review privilege in *Cannon v. Salt Lake Regional Medical Center, Inc.*, 2005 UT App 352, 121 P.3d 74. It held that, to establish existence of the care review privilege, the party asserting the privilege must provide an " 'adequate evidentiary basis' " to show that the documents were " *'prepared specifically* to be submitted for review purposes.' " *Id.* ¶ 18 (quoting *Benson*, 866 P.2d at 540).

¶ 116 The court of appeals then applied the rule to the defendant-hospital's claim that the care review privilege protected incident reports related to the plaintiff's claim. *Id.* ¶¶ 11, 18–24. The hospital had supported its privilege claim with an affidavit asserting the incident reports were created specifically for the hospital's Quality Assurance Department. *Id.* The affidavit also stated that the incident reports were used for the purpose of evaluating and improving the quality of health care at the hospital. *Id.* ¶ 12. Although the court of appeals found that the affidavit was sufficient to make a prima facie showing that the privilege applied, it concluded that the affidavit lacked " 'the evidentiary basis necessary for the trial court to make its determination of the issue of privilege.' " *Id.* ¶¶ 19, 21 (quoting *Benson*, 866 P.2d at 540). Specifically,

---

**38.** The Legislature amended sections 26–25–1 and 26–25–2 in 2002, 2003, and 2008. In this opinion, we rely on the version of the sections in effect in 2001 when the Wilsons filed their com-

plaint. *See* UTAH CODE § 26–25–1 (2001). While the Legislature has not amended section 26–25–3 since the Wilsons filed their complaint, we cite the 2001 version of the section for consistency.

the court of appeals reasoned that the affidavit failed to provide the "descriptive, detailed, and helpful information" necessary to determine whether the incident reports qualified for the privilege. *Id.* ¶ 20. Accordingly, it remanded the case to the trial court for a determination, based on in camera review, of whether the privilege applied. *Id.* ¶ 21.

¶ 117 Here, the trial testimony of Dr. Minton and Dr. Stoddard, along with our review of the data, convinces us that the Hospital's neonatal statistics qualify for the care review privilege. Dr. Minton and Dr. Stoddard both testified regarding the statistics. Dr. Minton testified that the Hospital gathers the statistics "for peer review, quality improvement, quality assurance, all of those mechanisms in order to give feedback to physicians and to staff." He also noted that the Hospital uses the statistics to identify "sudden changes in trends and increases in morbidity in a certain area or increased complications in a certain area or improvements in a certain area so we can go back and figure out what we are doing right" Similarly, Dr. Stoddard testified that the Hospital uses the statistics to "gauge [its] performance with [that] of other hospitals to find out if there are significant variations." This testimony establishes that the statistics are provided to statutorily authorized "peer review committees" and "in-house staff committee[s]." UTAH CODE § 26–25–1(2)(e),(h) (2001). The testimony also shows that the Hospital uses the data for "study, with the purpose of reducing morbidity and mortality" and "improvement of ... health care rendered by [the Hospital.]" *Id.* § 26–25–1(3)(a)–(b).

¶ 118 The statistics here differ from the incident reports at issue in *Cannon*. In *Cannon*, the incident reports related to a single patient. In contrast, the material at issue here is a compilation of individual patient data. The statistics include morbidity and mortality data for the years 1995 through 1999. While they include the name, time of death, and diagnosis of individual patients, the individual data is compiled into an annual summary. Further, the Hospital compiles the annual data into summary tables. One table tracks cumulative mortality from a base year of 1986 to the current year. Another summarizes, for the period 1995 through 1999, whether an infant survived and, if so, tracks the infant's need for ventilation, surgery or feedings, its neurological outcome, and its length of stay in the intensive care unit.

¶ 119 In summary, the reports at issue in *Cannon* related to individual patients. But here, the Hospital has compiled the data on individual patients into summary form. And trial testimony supports that the Hospital uses the summaries for "peer review" and "quality improvement." Because the evidence supports the conclusion that IHC prepared the statistics "*specifically* ... for review purposes," *Benson*, 866 P.2d at 540, we hold that they qualify for the care review privilege. *Cannon*, 2005 UT App 352, ¶ 21 n. 7, 121 P.3d 74 ("We can envision a narrow range of cases where it would be clear that [evidence] establishes, in and of itself, that the privilege applies. . . .").[39]

¶ 120 The Wilsons next argue that, even if the neonatal statistics qualify for the privilege, IHC waived it. Specifically, the Wilsons contend that IHC waived the privilege by sharing the statistics with patients and through Dr. Minton's and Dr. Stoddard's detailed references to the statistics in their depositions. But the Wilsons provide no record citations to support their claim that IHC

---

**39.** In their reply brief, the Wilsons assert that section 26–25–3 of the Utah Code is unconstitutional under the open courts provision, the separation of powers clause, and due process clause of the Utah Constitution and the due process clause of the United States Constitution. But they have failed to adequately brief any of these arguments. In support of their wide-ranging constitutional arguments, the Wilsons cite case law, but they provide nothing more. To satisfy rule 24(a)(9) of the Utah Rules of Appellate Procedure the appellant's argument "must provide meaningful legal analysis." *W. Jordan City v. Goodman*, 2006 UT 27, ¶ 29, 135 P.3d 874 (internal quotation marks omitted). Because the Wilsons do not provide any legal analysis, we conclude that their constitutional arguments are inadequately briefed and we decline to address them. We also note that the Wilsons do not allege that section 26–25–3 is unconstitutional pursuant to article 8, section 4 of the Utah Constitution. *See Carter v. Utah Power & Light Co.*, 800 P.2d 1095, 1097 n. 4 (Utah 1990). Accordingly, we express no opinion with respect to that issue.

shared the statistics with its patients or that the physicians referenced them in their depositions. And the Wilsons provide no legal authority or analysis to explain how such alleged statements could be construed as a waiver of the privilege in any event.

¶ 121 Rule 24(a)(9) of the Utah Rules of Appellate Procedure states that the appellant's argument "shall contain the contentions and reasons of the appellant with respect to the issues presented ... with citations to the authorities, statutes, and parts of the record relied on." To satisfy rule 24(a)(9), the argument "must provide meaningful legal analysis." *W. Jordan City v. Goodman*, 2006 UT 27, ¶ 29, 135 P.3d 874 (internal quotation marks omitted). Because the Wilsons provided no record citations, legal authority, or legal analysis to show how the doctors' alleged statements constituted a waiver, we decline to address this portion of the Wilsons' argument.

¶ 122 The Wilsons also claim that IHC waived any privilege by publishing "its morbidity and mortality statistics for its newborn ICUs in a public 2003 Annual Report." This claim is without either factual or legal basis. Publication of an annual report cannot constitute waiver because the statute specifically authorizes release of "a summary of studies conducted in accordance with Section 26–25–1 ... for general publication." UTAH CODE § 26–25–2(2) (2001); *see also id.* § 26–25–1(5)(c) ("No liability may arise against any person or organization as a result of ... releasing or publishing a summary of these studies in accordance with this chapter."). And there is no evidence that IHC published the statistics in any event. The Annual Report referenced by the Wilsons refers to morbidity and mortality ratios for the Newborn Intensive Care Unit at the McKay–Dee Hospital Center, not the Hospital in which Jared was born. We therefore hold that, on remand, IHC's neonatal statistics are "privileged communications and are not subject to discovery, use, or receipt in evidence." *Id.* § 26–25–3.

## CONCLUSION

¶ 123 During the trial of this matter, IHC's counsel adopted a strategy of persistently and deliberately referring to collateral source evidence. These references violated the trial court's in limine order, misled the trial court, and substantially prejudiced the Wilsons' case. As a result, we vacate the jury's verdict and remand this case to the trial court.

¶ 124 While our decision to reverse rests on the collateral source rule, we address the remaining issues raised by the parties to provide guidance to the trial court on remand. We hold that IHC's ex parte meetings with its employed physicians were permissible so long as IHC could be held vicariously liable for their conduct. But we conclude that it was improper for IHC to meet ex parte with Dr. Boyer, a physician whom it did not employ, without first providing notice to the Wilsons. We also hold that the trial court did not abuse its discretion by excluding from evidence IHC's nurse training modules. Finally, we conclude that the trial court erred in permitting the discovery and admission of IHC's neonatal morbidity and mortality statistics inasmuch as these statistics are protected by the care review privilege.

Justice PARRISH authored the opinion of the Court, in which Associate Chief Justice NEHRING, Judge ROTH, and Judge HIMONAS joined.

Justice LEE filed a dissenting opinion.

Having recused themselves, Chief Justice DURRANT and Justice DURHAM do not participate herein; Court of Appeals Judge STEPHEN L. ROTH and District Judge DENO HIMONAS sat.

Justice LEE, dissenting:

¶ 125 Today the court overturns a jury verdict entered in a complex medical malpractice trial spanning three weeks, awarding plaintiffs a new trial based on the conclusion that defense counsel's references to collateral source evidence prejudiced the jury and deprived plaintiffs of a fair trial. In remanding for a new trial, the majority also prescribes new standards to be applied in deciding whether to disqualify a witness as a sanction for a breach of fiduciary duty.

¶ 126 I respectfully dissent on both counts. First, I see no basis for awarding plaintiffs a new trial. I would find no error in the trial court proceedings, given that the trial judge sustained every viable objection raised by plaintiffs' counsel and took every appropriate action to keep the collateral source evidence from the jury. And even assuming arguable error, I would defer to the trial judge's finding that the references to collateral source evidence did not prejudice the jury to the extent of depriving plaintiffs of a fair trial. The trial judge was in the best position to make that assessment, and I would not second-guess it here.

¶ 127 I am also troubled by the court's articulation of standards for disqualification of a witness who breached a fiduciary duty. Plaintiffs never sought to disqualify Dr. Boyer in the proceedings below, but called him as a witness in their case-in-chief, so the question whether Boyer should have been disqualified was waived and is not properly before us. And even if this issue were ripe for our decision, I would not feel comfortable articulating standards for disqualification of a witness as a sanction for breach of fiduciary duty. That is a matter governed by our rules of evidence and procedure, and best left to the process of amendment of our rules.

### I

¶ 128 In reversing and awarding a new trial, the majority first finds error in the trial court's response to defense counsel's references to collateral source evidence and then concludes that such error requires a new trial because of its prejudicial impact on plaintiffs' right to a fair trial. I disagree on both points. First, I would affirm the trial court's treatment of defense counsel's reference to collateral source evidence because the trial judge did everything within his power—and everything he was asked to do by

plaintiffs' counsel at trial—to keep collateral source references from coming into evidence or from affecting the jury. Second, I would affirm the district judge's finding that the references to collateral source evidence at trial was insufficiently prejudicial to deprive plaintiffs of a new trial. That finding is entitled to substantial deference on appeal, yet the court makes only a passing reference to it. In light of that finding, I would affirm under an abuse of discretion standard, as the trial judge was in a much better position than we are to assess the impact on the jury of the handful of references to collateral source material in the course of a three-week trial.

### A

¶ 129 The majority's finding of error in the trial judge's treatment of collateral source evidence is rooted in its premise that "[s]ome errors may be too prejudicial for curative instructions to mitigate their effect, and a new trial may be the only remedy." *Supra* ¶ 54 (quoting *State v. Harmon*, 956 P.2d 262, 271 (Utah 1998)). With this qualifier to the general sufficiency of curative instructions in mind, the court deems the trial judge's response insufficient, suggesting that he failed to keep evidence from the jury by sustaining viable objections and failed to strike collateral source evidence from the record or to adequately instruct the jury to disregard it. *See supra* ¶¶ 54–56.

¶ 130 The majority's analysis is unsupported by the trial record as I understand it. It may be true that only two of the nine objections made by plaintiffs' counsel at trial were sustained by the trial judge. *Supra* ¶ 56. But almost all of the other objections were resolved by withdrawal of the question by defense counsel, leaving no need for a ruling on the objection or an immediate admonishing instruction.[1]

---

1. These instances include one—involving a question posed to Dr. Randle—that the majority cites as involving testimony given "[o]ver the Wilsons' objection." *Supra* ¶ 44. This exchange did involve a problematic question about whether Randle knew that the plaintiffs had "stipulated that there are no out-of-pocket expenses for medical [damages]." But the Wilsons' timely objection ultimately spurred defense counsel to voluntarily "withdraw the question," which in turn prompted a "thank you" from plaintiff's counsel, with no further request for a curative instruction or motion to strike. In this and many other instances, then, the court's failure to sustain the objection or immediately instruct the jury was not error, but merely an acknowledgment that an objectionable question had been withdrawn.

¶ 131 I can find only one exception in the trial record—one instance in which an objection to a question referring to collateral source material was not sustained. That exception involved an exchange with Jerome Wilson, who was asked and allowed to answer questions about out-of-pocket expenses incurred by the Wilsons. This exchange was at least arguably appropriate, however, as it happened early in the trial at a point at which it was not clear whether the Wilsons were seeking damages for out-of-pocket expenses. Given that uncertainty, there was a defensible basis for asking the Wilsons to clarify whether they were seeking such damages. And once they stipulated that they were not, the trial judge sustained all subsequent, viable objections to questions about collateral source evidence (i.e., objections that were not mooted by the withdrawal of the question).

¶ 132 In light of the trial judge's rulings on the Wilsons' objections, the remaining references to collateral source material at trial were attorney statements or proposed questions to witnesses that were never answered. Those statements and unanswered questions, however, were not evidence, and the jury was properly instructed to disregard counsel's statements and questions. *See infra* ¶ 141. The trial court's instructions to that effect, in fact, were the sum and substance of what the judge was asked to do to rectify these lingering remnants of references to collateral source material. We should not fault the judge for adopting the remedial measures requested by plaintiffs' counsel. Nor should we assume that the jury did anything but follow the court's instructions.

¶ 133 Thus, in my view the trial judge did all that he was appropriately asked to do in response to objections to defense counsel's questions about collateral source material. It may well be, as the majority suggests, that the court could have done more, but the fact of the matter is that plaintiffs' counsel never asked the trial judge to undertake additional curative measures. And since the trial judge was never asked to do so, he cannot in my view be reversed for failing to undertake further measures sua sponte.

¶ 134 The majority implicitly holds otherwise in concluding that the collateral source references at trial were too prejudicial to be overcome by curative instructions. Specifically, the majority faults the trial court for failing to give prompt instructions to the jury, noting that the "court did not give these instructions to the jury until after closing arguments." *Supra* ¶ 56. Yet no such instructions were requested at the time of counsel's objections, leaving us in no position to fault the court for failing to give them.

¶ 135 In Utah and elsewhere, the judge's gatekeeping responsibility is defined and shaped by the objections and motions made by counsel.[2] A judge's duty, therefore, is not to undertake proactive, sua sponte efforts to keep inadmissible evidence from affecting the jury, but to make appropriate rulings on objections or motions made by counsel in that regard.[3] The judge in this case did just that, and we should not fault him for properly performing his role in our adversary system.

¶ 136 A trial judge should not be deemed to have erred when he sustains all viable evidentiary objections and no further relief is requested by counsel.[4] That is what hap-

---

2. *See State v. King*, 2006 UT 3, ¶ 14, 131 P.3d 202 (citing *Polster v. Griff's of Am., Inc.*, 184 Colo. 418, 520 P.2d 745, 747 (1974), for the general rule that "the trial court has no duty to question each piece of evidence offered. . . . It should not assume the role of advocate and on its own motion, without request therefor, limit, comment upon, qualify, or strike evidence offered by the parties. These are the basic functions of trial counsel in our adversary system of justice and underlie the rationale of the contemporaneous objection rule"); *see also* UTAH R. EVID. 103(a) (noting that "[a] party may claim error in a ruling to admits or exclude evidence *only if* the error affects a substantial right of the party and" the complaining party either "timely objects [to]

or moves to strike" admitted evidence (emphasis added)).

3. *See Greer v. Miller*, 483 U.S. 756, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987) (noting that counsel bears "primary responsibility for ensuring" that any error in an improper question at trial is "cured in the manner most advantageous to his client," such that a curative instruction should not be considered on appeal if it was not sought at trial).

4. *See* ROBERT J. MARTINEAU ET AL, APPELLATE PRACTICE & PROCEDURE, CASES & MATERIALS 101 (2d. ed. 2005) ("[T]he cases are legion in holding that if an

pened here, and I respectfully dissent from the court's decision finding error where the judge did all he was asked by the parties to do.[5]

## B

¶ 137 I also dissent from the majority's finding of prejudice sufficient to sustain a new trial. Without reference to the trial court's own findings on the prejudice question, the court concludes that "IHC's trial strategy substantially prejudiced the Wilsons' verdict-worthiness before the jury." *Supra* ¶ 51. Only after it has reached its own independent conclusion on this question does the majority make reference to the trial court's determination that the collateral source evidence "did not result in a substantial error prejudicial to the plaintiff." *Supra* ¶ 52. But instead of deferring to the trial court's finding, the majority glosses over the applicable standard of review, holding that "[t]he trial court's ruling on the Wilsons' motion for mistrial and later motion for new trial do[es] not upset [our] conclusion [of prejudice]." *Supra* ¶ 52.

¶ 138 That conclusion is problematic (not to mention backwards), as the trial judge had a front-row seat in the three-week trial culminating in the judgment before us on appeal, and thus a firsthand sense of the impact of the collateral source references on the fairness of the trial.[6] Our perspective on appeal pales by comparison. We have only a cold paper record before us, with arguments and excerpts focusing on a few isolated aspects of the trial and an imperfect sense of how they fit into the larger picture of the full trial. In light of the trial judge's comparative advantage on these issues, our cases command a substantial degree of deference on appeal. Accordingly, we may reverse a trial court's finding of insufficient prejudice to sustain a new trial only upon a finding of an abuse of discretion.[7] I see no basis for finding an abuse of discretion here, and would accordingly affirm.

¶ 139 Unlike the majority, I see nothing "unclear" in the trial court's conclusions on this issue. *Supra* ¶ 52. In context, there is no doubt about whether the court "meant that no substantial *legal* error occurred" or

appellant objects and the objection is sustained but he does not move for a curative instruction or request a mistrial, he has received what he asked for and cannot be heard to complain on appeal."); 88 C.J.S. Trial § 232 ("Ordinarily the court is not required to carry in its own mind the details of the trial and, of its own motion, without a request therefor, strike evidence.... If evidence is admitted subject to rejection or to a motion to strike, and such motion is not made, the objection is waived."); *Garner v. Victory Express, Inc.*, 264 Ga. 171, 442 S.E.2d 455, 457 (1994) ("If the trial court does sustain [an] objection, counsel may not then urge on appeal that the trial court erred in failing to undertake any additional greater 'available action' which was not requested. In no case will the trial judge's ruling be reversed for not going further than requested." (internal quotation marks omitted)).

5.  Granted, there was one other set of requests made by plaintiffs' counsel that was rejected by the trial court-in the form of motions for a mistrial and for a new trial. The denial of those motions, however, rested principally on the trial judge's assessment of the prejudicial effect of the collateral source references on the jury, an assessment that I address below.

6.  *See State v. Kohl*, 2000 UT 35, ¶ 20, 999 P.2d 7 (noting the deference owing to decisions denying

a motion for new trial "because of the advantaged position of the trial judge to determine the impact of events occurring in the courtroom on the total proceedings"); *State v. Calliham*, 2002 UT 86, ¶ 23, 55 P.3d 573, 582 ("We review most evidentiary rulings and questions of fact with deference to the trial court based on the presumption that the trial judge, having person ally observed the quality of the evidence, the tenor of the proceedings, and the demeanor of the parties, is in a better position to perceive the subtleties at issue than we can looking only at the cold record.").

7.  *See Smith v. Fairfax Realty, Inc.*, 2003 UT 41, ¶ 25, 82 P.3d 1064 (holding that when a trial court denies a motion for a new trial, "[w]e apply an abuse of discretion standard," under which "we will reverse only if there is no reasonable basis for the decision"); *Kohl*, 2000 UT 35, ¶ 20, 999 P.2d 7 ("A trial court has discretion to grant or deny a motion for a mistrial and its decision will remain undisturbed absent an abuse of that discretion .... In other words, unless a review of the record shows that the court's decision is plainly wrong in that the incident so likely influenced the jury that the [movant] cannot be said to have had a fair trial, we will not find that the court's decision was an abuse of discretion." (alteration, citation, and internal quotation marks omitted)).

whether it found that "IHC's references, even if legally impermissible, had no prejudicial effect on the Wilsons." *Supra* ¶ 52. It was clearly the latter. After all, the court expressly stated that although it did not "like what[ ] happened" at trial with respect to collateral source references, there was no "substantial error prejudicial to the plaintiff" when those references were "taken in context with everything that [it] heard and what [was] presented in this case."[8] This is an unmistakable "finding[ ] with respect to prejudice," *Supra* ¶ 52.

¶ 140 I do not doubt that the presentation of "evidence of collateral source benefits 'involves a substantial likelihood of prejudicial impact.'" *Supra* ¶ 47 (quoting *Eichel v. New York Cent. R. Co.*, 375 U.S. 253, 255, 84 S.Ct. 316, 11 L.Ed.2d 307 (1963) (per curium)). The question on appeal, however, is not whether collateral source material is properly admissible in evidence. It is not, and it was (mostly) properly excluded at trial. The question, rather, is whether a series of references to collateral source material—almost exclusively in questions that were not answered and on which objections were sustained or acquiesced in—is so inherently prejudicial that it deprives the plaintiff of a new trial and requires a new one. That is not a matter to be resolved by citation to judicial precedent. It is a fact-intensive, case-specific question requiring an intimate knowledge of and experience with the case and with the impact on the jury of the particular references to collateral source material in the context of the trial. The trial judge found insufficient prejudice, and we should defer in light of that court's "reasonable basis for its decision." *Supra* ¶ 138 n. 7.

¶ 141 Finally, I cannot agree with the majority's conclusion that the trial court's jury instructions were not enough to cure any latent prejudice. *See supra* ¶ 56. Even if the trial court's actions were not perfectly or immediately curative, they were sufficient and timely. As noted above, the trial court sustained objections where necessary and correctly instructed the jury on issues of evidence and the collateral source rule both before the trial commenced and immediately before the jury's deliberation. *See supra* ¶ 55. At the beginning of trial, the jury was instructed that "[s]tatements and arguments of lawyers are not evidence in the case unless made as an admission or stipulation of fact"[9] That instruction was reiterated at the close of trial. Also at the beginning and again at the end of the trial, the trial judge instructed the jury that "[a]ny evidence as to which [it] sustain[ed] an objection and any evidence [it] order[ed] to be stricken must be entirely disregarded." And to clarify any doubt, the court preliminarily instructed that if during the course of the trial it "sustaine[d] an objection to a question that [went] unanswered by the witness, [the jury] should not draw an inference or conclusion from the question itself."

¶ 142 We should presume that the jury followed these instructions. Our case law, in fact, prescribes a presumption to that effect absent "overwhelming" proof of the jury's inability to do so and "a strong likelihood that the effect of the evidence would be 'devastating' to the defendant." *State v. Harmon*, 956 P.2d 262, 273 (Utah 1998) (quoting *Greer*, 483 U.S. at 767 n. 8, 107 S.Ct. 3102).[10] I see no basis for finding an "overwhelming probability" that the jury was un-

---

8. And this was not the only time the court considered this question. It reached the same conclusion in denying plaintiffs' mid-trial motion for mistrial.

9. Attorney statements are not generally admissible as evidence. *See State v. Horr*, 63 Utah 22, 221 P. 867, 877 (1923) (quoting New Hampshire case for proposition that "the statements of counsel are not evidence; that the court is bound so to instruct the jury, and that they are sworn to render their verdict only according to evidence") *See also, e.g., Kohl*, 2000 UT 35, ¶ 6, 999 P.2d 7 (noting that a trial court correctly instructed jury

that "[s]tatements of the lawyers are not evidence in the case."); *State v. Peterson*, 722 P.2d 768, 770 (Utah 1986) (same); *State v. Kazda*, 540 P.2d 949, 951 (Utah 1975) (same).

10. *See also State v. Harmon*, 956 P.2d 262, 273 (Utah 1998) (noting that, in addition to giving a "curative instruction at the time the error occurred," the trial court also "gave several preliminary instructions before trial began, one of which admonished the jury to disregard any evidence which the judge ordered inadmissible").

able to follow the trial court's instructions in this case. I would accordingly affirm the trial court's finding of a lack of prejudice sufficient to merit a new trial, particularly where it made every effort to instruct the jury to disregard any remaining vestiges of collateral source material in the record.

## II

¶ 143 I also take issue with the court's decision to prescribe standards for disqualification of a witness (Dr. Boyer) for an alleged breach of fiduciary duty. That remedy was not sought below, as the Wilsons never moved to disqualify Dr. Boyer, but instead called him as a witness in their case-in-chief.[11] That fact ought to be dispositive on appeal. The Wilsons not only failed to preserve a basis for disqualifying Dr. Boyer as a witness; they affirmatively waived any such argument by calling him in their case-in-chief. And their failure to preserve that issue below precludes them from raising it here.[12]

¶ 144 That is reason enough to decline to proceed down the path the court follows to-day. But even if the question of disqualifying a doctor who breached a fiduciary duty were properly presented, I still would not agree with the majority's decision. I read the rules of evidence to occupy the field regarding the competency of a witness to testify.[13] just as I read the rules of procedure to occupy the field of the court's authority to sanction a party for a discovery abuse.[14] And because the Wilsons have identified no basis in either set of rules for foreclosing Dr. Boyer's testimony, I dissent from the court's decision to promulgate a new set of standards for that purpose in its opinion today. If we are to exercise our authority to promulgate new rules, we should do so through the rulemaking procedures we have established for that purpose.

¶ 145 Today's decision strikes me as an effort to sidestep those procedures in the interest of punishing what the court sees as improper conduct by one of the parties. But the remedy for any breach of fiduciary duty lies outside the matters before us on this appeal. A remedy for any breach of fiduciary duty should be meted out in a separate suit filed on that claim.[15] It is a mistake to

---

**11.** It appears that the Wilsons did not ask the trial court to preclude Dr. Boyer from testifying, but instead pressed only to be permitted to challenge his credibility on cross-examination by noting Boyer's ex parte communications with IHC and asking the jury to deem his testimony biased. And it appears that is exactly what the district court allowed and what happened at trial. Plaintiffs' counsel called Dr. Boyer as a witness and challenged him for meeting with IHC's counsel in a manner that was "unethical, illegal, and dishonest." Counsel challenged Boyer on this point at some length, indicating that the ex parte meeting was improper under Utah Supreme Court precedent.

If plaintiffs never sought to exclude Dr. Boyer, but only to be permitted to challenge his credibility on cross-examination by suggesting that he breached a fiduciary duty, then it cannot be error to have given plaintiffs exactly what they asked for.

**12.** *State v. King*, 2006 UT 3, ¶ 13, 131 P.3d 202 ("[A] defendant who fails to preserve an objection at trial will not be able to raise that objection on appeal unless he is able to demonstrate either plain error or exceptional circumstances.... Stated another way, under our preservation rule, defendants are not entitled to both the benefit of not objecting at trial and the bene-

fit of objecting on appeal." (alteration and internal quotation marks omitted)).

**13.** *See, e.g.,* Utah R. Evid. 601(a) ("*Every* person is competent to be a witness unless these rules provide otherwise.") (emphasis added).

**14.** *See, e.g.,* Utah R. Civ. P. 37(e) (authorizing and suggesting the kinds of appropriate sanctions when a party violates a court discovery order).

**15.** The court's decision to the contrary will likely generate extensive satellite litigation in medical malpractice cases. The focus of such cases ought to be the merits of the malpractice case. If the majority's suggested remedy is adopted, it will require trial courts to evaluate whether there was a breach of a fiduciary duty by a witness, who instigated the breach, to what extent that breach played into the evidentiary picture of the current trial, how the evidence impacts the case under the appropriate burden of proof, and what the appropriate remedy would be. These questions are at least arguably best resolved in a separate suit for breach of fiduciary duty. We should not be requiring such satellite litigation by judicial fiat. At a minimum, such a question ought to be addressed through the normal process of amendment to our rules of evidence and procedure.

confuse the rules of evidence and procedure with judicially created criteria for disqualification of a witness charged with breach of fiduciary duty.

¶ 146 As a general rule, a witness who has breached a fiduciary duty of confidentiality is not incompetent to testify, but simply subject to sanctions and remedies for the harm caused by the breach.[16]  A lawyer who has breached a duty of confidentiality to a client, for example, is subject to professional sanctions and liable for breach of fiduciary duty, but is not barred from presenting testimony in court.[17]  I see no reason to subject doctors to a standard different from the one the law has long applied to lawyers.  And if we were going to sustain such a distinction, we should do so through the normal process of amending our rules of evidence or procedure, not in a judicial opinion.

¶ 147 The majority gets off on the wrong foot in asserting that this case presents the question whether IHC's ex parte meetings were "permissible" under the law governing a physician's fiduciary duties to his patients. *Supra* ¶ 83.  That is not an issue before us on this appeal.  This is not a case like *Sorensen v. Barbuto*, 2008 UT 8, 177 P.3d 614, or *Debry v. Goates*, 2000 UT App 58, 999 P.2d 582, both of which involved claims by patients against physicians for breach of fiduciary duty.  The Wilsons are not suing Dr. Boyer for breach of fiduciary duty.  They are suing for negligence in the medical care provided during Ms. Wilson's labor and delivery of Jared.  In the trial resulting in a verdict for defendants in that case, the district court was never asked to determine whether Dr. Boyer breached a fiduciary duty in meeting with IHC. Nor was the court even asked to decide whether Dr. Boyer could testify as a competent witness, as the Wilsons themselves called him in their case-in-chief.

¶ 148 Thus, the court ventures into advisory dicta in assessing whether and to what extent Boyer may have breached a fiduciary duty.  That is a matter to be addressed, if at all, in a future case filed against him on a fiduciary duty claim.  Under our rules of evidence and procedure as they currently stand, there is no basis for disqualifying Dr. Boyer from testifying on the basis of an alleged breach of fiduciary duty.

¶ 149 I do not doubt that this court possesses "inherent" judicial power to manage the parties and counsel in cases before the courts.  *Supra* ¶ 94.  But we have settled mechanisms for exercising that power when it impacts established rules of evidence and procedure.  When we see a need to adapt our rules, we do so through a structured amendment process that involves the advisory committees we have appointed for that purpose, with time and opportunity for comments from the bench and bar in an orderly process of amendment.  We follow that process for good reason.  We should defer to that process if we see a need to adopt a new rule on sanctions against a witness or counsel or on competency of a witness to testify.  I dissent from the court's decision to sidestep that process in its decision today.

---

16.  *See* R. Collin Mangrum & Dee Benson, Mangrum & Benson on Utah Evidence, 351–52 (2010–2011 ed.).

17.  *Id.* ("The question remains whether lawyers are incompetent to testify where disciplinary rules proscribe such testimony.  The short answer is no."); *see also Universal Athletic Sales Co. v. Am. Gym, Recreational & Athletic Equip. Corp.*, 546 F.2d 530, 539 n. 23 (3d Cir.1976) (concluding that there is no "judicial precedent" to support "incorporating within the body of evidentiary rules the current disciplinary norm proscribing the testimony of a lawyer for his client").